# REPORTS

OF

# CASES ARGUED AND DETERMINED

## At June Term, 1854.

---

STEIN *vs.* THE MAYOR, ALDERMEN, &c., OF MOBILE.

24 591
126 613
24 591
o135 166

1. The contract between the corporate authorities of Mobile and Albert Stein, by which the latter became the lessee and proprietor of the City Water Works for the term of twenty years, does not exempt his interest in said water works from taxation by the city, inasmuch as the contract contains no stipulation for such exemption. (Re-affirming Stein v. The Mayor &c. of Mobile, 17 Ala. 234.)

2. The only legitimate object of taxation is, the support and maintenance of the government ; but this does not mean the expenses incurred by the mere machinery necessarily employed in its administration and conduct : the power extends to the employment of all those means and appliances which are ordinarily adopted, or which may be calculated, to develop the resources of the State, and add to the aggregate wealth and prosperity of her citizens ; such, for example, as providing outlets for commerce, opening up channels of intercommunication between different parts of the State, improving the social, moral and physical condition of her people by wholesome police regulations, and by a judicious system of public instruction, as also for the protection, security and perpetuity of her government and institutions.

3. The power to levy a tax for local purposes may be delegated by the Legislature to a municipal corporation ; it is no objection to an act delegating such power, that it requires the assent of three-fifths of the tax-payers to be obtained before the tax is levied ; and the fact that the railroad, to aid in the construction of which the tax is imposed, extends beyond the limits of the city, or even of the State, does not render it less local, or in any way affect the validity of the statute or of the tax.

4. The acts of January 5, 1850, and December 20, 1851, authorizing the corporate authorities of the City of Mobile to levy a tax on the owners of real estate within the limits of the city, to aid in the construction of the Mobile and Ohio Railroad, are not unconstitutional.

5. The City Water Works of Mobile are taxable as real estate by the corporate authorities of the city ; and a lessee who holds under a contract with the corporation, by which he acquires all their corporate rights and privileges in the water works for the term of twenty years, and in perpetuity if not then redeemed by the city, is liable for the tax assessed against said water works.

APPEAL from the City Court of Mobile.

Tried before the Hon. ALEX. McKINSTRY.

THIS case was submitted to the decision of the Hon. Alex. McKinstry, upon the following agreed statement of facts :

"The mayor, aldermen and common council of the City of Mobile, being entitled to certain water privileges, for the benefit of the citizens of Mobile, in the waters of Three Mile Creek, under the act of December 20th, 1820, and other acts subsequently passed on the same subject, on the 26th day of December, 1840, granted or leased to said Albert Stein the sole right to supply the said city with water ; which contract and agreement is hereto attached, as a part of this case. In accordance with this contract, the said Stein erected the works now known as the Mobile Water Works. These works are composed as follows : The water is introduced into two reservoirs on the banks of the Three Mile Creek, from a point on said creek ; said reservoirs being outside of the city limits. The water is then brought into the city, by means of cast-iron pipes, of about eight inches bore, passing along Spring Hill road, to a reservoir within the city, about two miles from Mobile River ; this latter reservoir is located on a lot belonging to said Stein. By means of said iron pipes, which are buried three or (*four ?*) feet under ground, the water is conducted into the city, and along the streets ; and by means of small lead pipes the water is carried, from the main pipes under ground, into the houses and lots of the citizens, who pay to the said Stein stipulated prices therefor annually.

"The Legislature of Alabama passed an act, approved the 20th December, 1851, entitled " an act to authorize the corporate authorities of the City of Mobile to levy a special tax, for the purpose of aiding the Mobile and Ohio Railroad ; which act, and the act to which it refers, passed on the 5th January, 1850, are made parts of this agreement. Under and by virtue of this act, an election was held according to the provisions

thereof, at which the real estate owners, who had paid on their stock over twenty per cent., voted, with others, in favor of said taxation; but said Stein did not vote at said election, and has by no act sanctioned the law authorizing said taxation. At said election; a large majority was found to be in favor of said law; and the same went into effect according to its provisions, under and by authority of which a tax of two per cent. has been levied on said water works; valuing the same at $75,000, and making a tax of $1500, which they claim and are enforcing by the proceedings directed by said act.

"It is agreed, also, that all ordinances of the City of Mobile, and all existing acts of the Legislature, touching the said water works, may be considered in evidence, and before the court, and may be referred to, as a part of the record, by either party, before this court or the Supreme Court.

"The questions for the court are: 1st, whether said tax law is constitutional, and can be enforced; 2nd, whether said water works come with in the act, and are taxable under it; and, 3rd, if so, whether Stein, the present proprietor or lessee, is liable for said tax."

The contract under which Stein became the lessee of the City Water Works, above referred to as being "hereto attached as a part of this case," nowhere appears in the record, but it is substantially stated in the report of the case of Stein v. The Mayor &c. of Mobile, 17 Ala. 234.

His Honor, Judge McKinstry, held, "that the said acts of the Legislature, above referred to, are constitutional, and may be enforced; that said water works come within the provisions of the act, and are taxable under it; and that Stein, being the owner of the land, and of the pipes and privileges attached to said land, and in possession thereof, is liable to pay said tax;" and judgment was accordingly rendered against Stein, as on a special verdict, for the amount of the tax assessed against said water works. This judgment is now assigned for error.

F. S. BLOUNT and JOHN T. TAYLOR, for appellant:

The questions arising upon this record are three: 1st. Whether the third and subsequent sections of the act of the Legislature to amend and explain "an act to incorporate the Mobile and Ohio Railroad Company," approved 5th January,

1850, and " an act to authorize the corporate authorities of the City of Mobile to levy a special tax," are constitutional and can be enforced ; 2nd. Whether the Water Works described in the record come within the act, and are taxable under it ; and 3d. Whether the plaintiff in error, the present lessee, is liable to pay the same.

It is conceded that the power of taxation is inherent in every sovereignty, and extends not only to the people and property of a State, but it may be exercised upon every object brought within its jurisdiction. While this admits of no doubt, there are certain restrictions imposed upon the taxing power in its application to the purposes for which taxes are imposed, as well as upon the manner in which they are levied. The chief and only legitimate object of taxation, according to the theory of our republican institutions, is for the purpose of raising revenue for the support and maintenance of the Government. Where all the members of a political confederacy are equally entitled to the benefits, which the proper administration of the Govern. ment confers upon all alike, so all are equally liable to the support of the Government. Not indeed in the same amount to be contributed by each one, but in proportion to their owner-ship of those articles of property which are declared to be the subjects of the taxing power constitutionally exercised. If taxation is then restricted to raising the necessary revenue for the support of the Government, it must necessarily follow, that when taxes are imposed for other purposes than those strictly applicable to the use of the State as a sovereignty, and to be disbursed by the State for the equal benefit of all its citizens, such taxation is an unwarrantable and unconstitutional assump-tion of power, not conferred upon the Legislature, and in its tendencies destructive of the privileges and rights of its citizens.

The first proposition in the series presented questions the constitutionality of the acts of the Legislature therein men-tioned, and denies its right to levy the taxes for the benefit of the corporation therein named, and in the manner and upon the property therein set forth. It is insisted : 1st. That this is investing in a few private citizens separate and exclusive priv-ileges, in violation of the first section of the first article of the Constitution ; 2d. That it is a delegation of State sovereignty to a private corporation, in derogation of the equal rights of

every other citizen of the State to share therein; 3d. That said laws are partial in their operation, being confined to the City of Mobile; 4th. That they are unequal in their application, being restricted solely to the real estate owners in the city of Mobile; 5th. That they are unjust, arbitrary and oppressive in these particulars : 1st. That the owners of real estate in the City of Mobile are taxed 2 per cent. per annum, for five years, upon the value of their real estate, without any just benefit or equivalent therefor; 2d. That the personal estate of the citizens of Mobile is exempt from taxation by these acts, and that there is no good reason shown for said exemption; 3d. That the real estate of the stockholders in said Mobile and Ohio Railroad Company is exempted from this taxation in this : that those who have personally subscribed to the stock of the said company, shall, for all sums paid on said stock over and above 20 per cent., be allowed to deduct the same from the tax collectable under this act; 4th. That that portion of said stockholders residing in the City of Mobile, voted to tax the property of the real estate owners for their personal benefit and emolument; the tax so raised going towards the building of said road, which, when built, or as far as built, is the private property of said stockholders; 5th. That the tax so raised is not appropriated to any public use, but takes from one citizen his property and vests it in another without any consideration, and in this case, against his own consent; 6th. That the provision of the law authorizing the tax payer to receive script in the stock of the company, makes the tax a forced loan without corresponding value received, as the stock of the company is worth only 60 to 70 cents in the dollar, and the tax payer is compelled to pay cent per cent; 7th. That by the operation of this law, the citizens of Mobile, owning real estate, are taxed for the benefit of the citizens of Mississippi, Tennessee, and Kentucky, owning stock in the railroad, and to build a road three-fourths of which is without the jurisdiction of the State of Alabama.

It will hardly be contended, that the Mobile and Ohio Railroad Company is not a private corporation, composed of private individuals, who, to promote private fortunes, and to reap the advantages of private enterprise, have associated themselves together. The fact that the Legislature has clothed them with

corporate powers to build a road, invests them with no other prerogative than would belong to an individual citizen embarking in the same enterprize. "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. Among the most important are immortality, and, if the expression may be allowed, individuality—properties by which a perpetual succession of many persons are considered the same, and may act as a single individual. They enable a corporation to manage its own affairs, and to hold property without the perplexing intricacies, the hazardous and endless necessity of perpetual conveyances, for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men in succession with these qualities and capacities, that corporations were invented and are in use. By these means a perpetual succession of individuals are capable of acting for the promotion of the particular object, like one immortal being. But this being does not share in the civil government of the country, unless that be the purpose for which it was created. Its immortality no more confers upon it political power or political character, than immortality would confer such power or character on a natural person. It is no more a State instrument, than a natural person exercising the same powers would be."—Dartmouth College v. Woodward, 4 Wheaton's R. 636.

Can this corporation, then, which is purely private, be clothed with the power belonging to the Legislature to levy and collect taxes, or rather to have taxes levied and collected for its benefit. Shall it be private in its ownership, in its direction, in its interests ; public in its rights and privileges—a private speculation, an investment of moneys belonging to private persons, yet clothed with the sovereign power of having taxes levied for its purposes, and their application uncontrolled. Are the rights of the citizens of Mobile to their real estate inferior and subordinate to the right of this corporation to exact from them a per centage on its value for five years. If so, the creature of the law is beyond the constitution ; the privileges granted to it by

the Legislature are above the inhibitions of the fundamental law, from which the Legislature itself derives its power; and we have, if this right is to be sustained by the judgment of this court, a clear illustration of legislative usurpation affecting the dearest rights of the citizen, and, in its results, revolutionizing the government. The essence of all political power is from the people, because, as to every political right they are sovereign. In forming the Government of the State of Alabama, there are certain rights enumerated in the Constitution, which are excepted out of the powers granted by that instrument. It is expressly declared that this enumeration of certain rights shall not be construed to deny or disparage others retained by the people; and all laws contrary to the enumerated or retained powers shall remain void.—Art. 1, § 30.

There is but a single section in the Constitution in relation to taxation, and it is in the following words: " All lands liable to taxation in this State shall be taxed in proportion to their value." —8th Section, VI Article. Whence, then, is the power of levying taxes derived by the Legislature? Certainly from the sovereignty of the political body or people. But the Legislature is not a soverignty. It is the mere authorized agent of the constitution or organic law, and is limited, restricted and controlled by the words and terms of the instrument by which itself is created. The power to levy taxes for the support of the Government is an implied one under our constitution, and cannot be extended beyond the means necessary to the end. Were this not so, the power of taxation which the Legislature could exercise, would be boundless and unrestricted, confined to no object, limited by no end. It cannot be seriously contended, that there is no check to the exercise, either arbitrarily or inconsiderately, of this power by the Legislature, which, of all the other powers of government, has been most jealously guarded and restrained, both in England and this country, from the time of Magna Charta to the present hour. And it may be said to have been the fruitful mother of revolutions, each one nobly and successfully asserting the liberties of the subject and citizen. In England, during the reign of Charles I, the right to levy ship money was introduced in the year 1634. " The first writs of this kind had been directed to sea port towns only; but ship money was at this time levied on the whole kingdom, and

each county was rated at a particular sum which was afterwards assessed upon individuals. The amount of the whole tax was very moderate, little exceeding two hundred thousand pounds. It was levied upon the people with .equality. The money was expended upon the navy, to the great honor and advantage of the Kingdom : as England had no military force, while all the other powers of Europe were strongly armed, a fleet seemed absolutely necessary for her security, and it was obvious that a navy must be built and equipped at leisure during peace ; nor could it possibly be fitted out on a sudden emergence when the dangers became urgent ; yet all these considerations could not reconcile the people to the imposition. It was entirely arbitrary. By the same right any other tax might be imposed ; and men thought a powerful fleet, though both very desirable for the credit and safety of the Kingdom, but an unequal recompense for their liberties, which they apprehended were thus sacrificed in obtaining it."—Hume's History of England, 5th vol., p. 79. The Great Charter exacted by the Barons from King John at Runnymede on the 15th June, 1215, embodies the great principles of English liberty. In the language of an eloquent writer, " to have produced it, to have preserved it, to have matured it, constituted the immortal claim of England on the esteem of mankind." In declaring that " no scutage or aid, except in the three general feudal cases, the King's captivity, the knighting of his eldest son, and the marrying of his eldest daughter, shall be imposed, but by the great council of the kingdom," the principle is broadly stated, so resolutely defended by every Englishman, that the consent of the community is essential to just taxation. With us, that consent can be expressed in only one way, and that is in the words of the constitution. And the same spirit which induced the illustrious Hampden to oppose this tax, to brave the whole power of the court, and to sacrifice his fortunes to the defence of the liberties of the people of England, animated our revolutionary fathers in their stern opposition to the tea duties and stamp act. In this case, while the plaintiff in error admits the legislative right to levy taxes, he insists that there is a constitutional limit to the right; and that the Legislature, in authorizing the mayor and aldermen and common council of the City of Mobile to levy taxes on the citizens

of Mobile, which were to be paid over to the treasurer of the Mobile and Ohio Railroad Company, usurped a power they did not possess under the constitution, and granted to the set of men composing that company exclusive privileges, not in consideration of public services, and in derogation of the equal rights of the citizens of the State of Alabama.

It may be argued, that the consideration for the right of taxation was the benefit which would accrue to the City of Mobile in the increased value of her real estate, the great population which would inhabit within her limits, and her increase in business and wealth. To this it may be answered, that the same argument applies with equal or greater force to the owners and proprietors of the steamboats navigating our waters, and bringing the great staple of the South to our market ; yet who would be wild and visionary enough to assert that the Legislature had the power to tax any interest in our city for the benefit of the owners of steamboats, compelling the proprietors of such interests to take stock in steamboat companies, and authorizing a sale of their property if such tax were not paid. Can anything be conceived more arbitrary, tyrannical and unjust? and yet, no one can point out the difference between the two cases ; both common carriers ; both receiving toll or compensation for transporting passengers and goods ; both *private* property, owned by *private* individuals ; and both, so far as a public benefit is concerned, upon a perfect equality. The difference in favor of the steamboats is, that they navigate wholly *within* the State, are owned *within* the State, and their disbursements are wholly *within* the State ; thus adding capital, encouraging labor, and performing, as effectually as railroads, their engagements to the public. Why are they not equally entitled to be the recipients of legislative munificence with the Mobile and Ohio Railroad Company, and have a tax imposed upon the *personal* estate of the City of Mobile, as a set of men entitled to exclusive privileges, in consideration of public services ?

But it may be said, that this is a tax levied by the corporate authorities of the City of Mobile, with the consent of three-fifths of the tax payers of the city who own real estate liable to taxation. Without stopping to examine the right of a guardian to bind his ward, by voting for this tax, or the tenant to bind

his lessor, as authorized by the act of 1851-'2, it may be re-
plied, that the City of Mobile is a municipal corporation, acting
under the authority of a charter—that whenever any provision
of that charter contravenes the rights of sovereignty of the
State or its citizens, it is absolutely void, and the fact that it
was granted by the Legislature gives it no other or greater
efficiency than it would have without such grant. It will hardly
be contended that the object of a municipal incorporation is to
erect stock banks or trading institutions, or if put in operation
by *private* means and owned by *private* citizens, to compel her
citizens to contribute, by taxes, to swell the capital and extend
the stock list of such an establishment. And yet, this is a
public benefit to the mercantile interests of a city, and an in-
dispensable agent in mercantile transactions ; yet who would
defend so odious a scheme, as a compulsory measure, within the
power of the Legislature, to interfere with the private pursuits
of the citizen, by compelling him to embark his property, against
his will, in the business of stock banking ? "For imposing
taxes upon us without our consent," was one of the charges
contained in the Declaration of Independence against George
III ; and it makes but little difference with the principle,
whether the tax goes into the treasury of a tyrant, or into the
coffers of a corporation, sovereign and despotic in the usurped
power of taxing the citizen.

But, it may be said that the tax is returned to the payer in
the stock of the company; and what does this prove? Simply,
then, that it is a FORCED LOAN ! What if the speculation fall
through ? For many causes combine to defeat it. Why, then,
the tax payer loses his money, and is consoled by the reflection
that, by unwise and unconstitutional legislation, he has been
deprived of his property, embarked against his wishes and his
judgment, in visionary speculation.

It will, doubtless, be argued that the clause of the constitu-
tion which we have been considering. (§ 1, Art. I,) has no appli-
cation to this case, because the right or power of taxation is
not granted to the railroad corporation, but to the corporate
authorities of the City of Mobile, and thus the objection is
eluded—doubtless perceived by the friends of the railroad
before the measure was perfected. "Whatever is done in fraud
of the law, is done in violation of law," is a sound legal max-

im ; and whatever is done in fraud of the constitutional rights of the citizen, is done in violation of them and of good government. The Railroad Company is made the recipient of the moneys collected under the law ; the acts for its benefit contain the power, vested in the corporate authorities of the City of Mobile, to levy the tax ; and as it was not one of the objects of the creation of the city government of Mobile to build railroads, and did not enter into the intention of the Legislature in granting its charter to vest it with any such power ; and as it has no power, either under its charter, or by virtue of the law under which the tax is collected, of receiving, controlling, or in any manner directing or disposing of the fund, it is very evident that it acted merely as the agent of the legislative will.

Will hyper-criticism suggest, that the clause of the constitution which has been considered (1st section and 1st article) has no application to a case of this character, but must be confined to that class of cases where the privilege or emolument is personal and individual, and embraces no questions of property ? If so, what is the definition of privilege ? " A particular and peculiar benefit and advantage, enjoyed by a person, company or society, beyond the common advantages of other citizens."— Webster's Dict., " Privilege." It would be a difficult matter to imagine a more peculiar benefit enjoyed by a company beyond the common advantages of other citizens, than the right or benefit of having private property. taxed and the money paid over to the company.

This case has been considered with reference to the constitutional powers of the State of Alabama to pass the acts in question, and the right is denied, because it is contended that without constitutional sanction it would be usurpation in the Legislature, and a violation of the sovereignty of the citizens of any particular section of the State, and of all the citizens of the State, which it is insisted is indestructible, inherent in them as citizens, and which cannot be divested out of them, unless by the acts of a convention to form a constitution, and the express grant of the power in question.

It is true that decisions in other States may be found, where cognate questions have been decided in favor of the power contended for. Yet in all or most of the States where these decisions have been made, they have been attempted to be sustained

upon the grant of some express or implied power contained in the State constitution. Yet they all present the fact that the same objections have been urged, and with a directness of application, a power of analysis, and a cogency of argument that was unanswerable. The case of The Police Jury of the Right Bank, &c., v. The Succession of John McDonough, was decided at the June term, 1853, of the Supreme Court of the State of Louisiana. Upon an examination of this case, it will be found that the constitution of Louisiana expressly provides for aid to railroad and other improvements within the State. And alluding to the fact, C. J. Slidell, who delivered the opinion of the court, holds the following language. " The constitution of 1852 was not in existence when the act of March, 1852, was passed. That act is not inconsistent with the letter nor the spirit of the constitution of 1852, and consequently remained in force after its adoption under the conservative effect of the article 143. It is inadmissible to suppose that the convention which assembled after the passage of that law, and done its labors on the 31st July, 1852, was ignorant of its provision. One of the reasons why a change of constitution was desired, as is well known and forms a part of our political history, was the popular wish to disembarrass some of the trammels of the constitution of 1845. One of them was a prohibition to pledge the faith of the State for any bonds, bills or other contracts, or obligations for the benefit or use of any person or persons, corporation or body politic whatever. In this respect a grave change was made by the constitution of 1852 ; whether wisely or imprudently, time will determine." " The Legislature was authorized thereafter to grant State aid to companies or associations, formed for the exclusive purpose of making works of internal improvements, wholly or partially within the State.— The subject of internal improvements then occupied intensely the public mind. The people assembled in convention were determined to place it in the power of future Legislatures to foster and encourage them." And until the people of Alabama assemble in convention, and authorize future Legislatures to exercise the power contained in the acts heretofore cited, if enforced against any of the citizens of the State, it can only be done by legislative usurpation and judicial legislation.

Separate and apart from the legal question which this case

presents to the court, there are others of a grave character growing out of political considerations, which must, sooner or later, be productive of the most serious disturbance in our political system. Chartered monopolies of every character are inimical to republican institutions. The aggregation of wealth with chartered privileges must find its sphere of action among those classes of our citizens who are not favored either with the advantages or exemptions with which they have to contend. The purity and simplicity of the government becomes complicated, by having its energies controlled, and its legislation hampered by the injudicious divestiture of constitutional powers, which it has conferred upon corporations without power of resumption, as it cannot impair the obligation of its contracts. And however desirable it might be for the States within which works of every kind tending to the advancement of the energies, wealth and prosperity of its people are projected, to lend their fostering aid, it is the part of wisdom for her Legislature, courts, and people, to remember, that every successful assault made upon the constitutional rights of any, the meanest of her citizens, lessens the tie which bind them to their government, destroys their reverence for their constitution, which affords them no protection at the hands of their Legislature or their courts, and fits them for any change, be it despotism or anarchy.

II. The second question presented for the consideration of the court is, whether the water works come within the act and are taxable under it. The act of December, 1820, creating the Mobile Aqueduct Company, is the only original charter by which the present water works belonging to the city exist.— Various enactments were subsequently made in 1824 and 1837. On the 26th December, 1840, a contract was made between the corporate authorities of the City of Mobile and Albert Stein, which was subsequently confirmed by the act of the Legislature, approved January 11th, 1841. By the operation of the various acts referred to, the franchise was vested in the corporate authorities of the City of Mobile. As such, it was not the subject of taxation when the franchise and the taxing power were united. The question then is, whether under the agreement made between the city authorities and Mr. Stein this franchise is liable for the taxes authorized by the acts of 1851 and 1852 herein before set out. It may be well to remark

here, that this court has decided, that the water works were subject to taxation for municipal purposes; but with every respect for the opinion of the court, I think the decision is erroneous, and that the error consisted in regarding the franchise as the private property of Mr. Stein, and the apparent incongruity of the city taxing its own property.

The act of 1851, by the first section, confirms the agreement made between the city authorities and the plaintiff in error.— By the second section, "all the rights, powers, privileges and immunities, which were granted to the Mobile Aqueduct Company, and the mayor and aldermen of the City of Mobile, by act of 30th December, 1820, not inconsistent with the terms of the before mentioned agreement, be, and the same is hereby, granted, vested in, and confirmed to the said Albert Stein and his assigns. By the third section, " all the rights, powers, privileges and immunities which were granted to the Mobile Aqueduct Company and to the mayor and aldermen of the City of Mobile, by the act of 25th December, 1837, be, and the same is hereby, vested in, and confirmed to, the said Albert Stein and his assigns·" Now Mr. Stein has a right to defend the possession of the franchise from taxation, by the virtue of the terms of his contract. Whatever rights, powers, privileges or immunities, were had, held, exercised or enjoyed, they were conveyed to him precisely in the same manner and in no other, in which they were possessed and held by the City of Mobile. The agreement contains no reservation of the taxing power. It is a contract between the parties, and is the law agreed upon between them. The city has no more right to interpolate or add a new term to the contract than has Mr. Stein. Any law, whether municipal or state, attempting to do this, would impair the obligation of the contract, and would be void under the constitution. The agreement was for a lease for twenty years. At the end of that time the possession of the works is to be surrendered by Stein to the city. Neither the agreement, nor the acts of the Legislature confirming it, contemplated the transfer of the franchise. The right to its exercise was conveyed. Nothing more. If this be so, then the city authorities assume the power to tax the mere possession of the right to exercise a franchise; the franchise still being in themselves.

The decision of the Supreme Court is based on the assump-

tion that the franchise itself was conveyed by the contract to Mr. Stein. In the case of Stein v. Mayor and Aldermen, 16 Ala. 241, Dargan, C. J., delivering the opinion of the court, says : " A privilege or franchise may not be liable to seizure and sale, but it is contended that the charter only authorizes the corporate authorities to tax real and personal property, and that this privilege is neither. In answer to this, we will only say, that it cannot be considered as a right of action merely, but it is property in possession, and being property (Quere—what sort of property ?) it must be embraced within the one or the other of these terms ; for we know of no species of property, that cannot be said to be either real or personal, whether it be corporeal or incorporeal." So that we are somewhat left in the dark as to what description of property, the interest of the plaintiff in error had in the water works. By referring, however, to the decision of this court in the case of Lewis v. Stein, 16 Ala. 217, we are told in the opinion of the same judge : " The plaintiff (in the court below), entered into a contract with the city authorities on the 26th December, 1840, by which he became the lessee of the water works for the term of twenty years. The contract was submitted to the Legislature of the State, and by the act of the 17th January, 1841, was ratified and confirmed, and all the rights, powers, privileges and immunities that had been granted to the Mobile Aqueduct Company and the City of Mobile, by the act of 1820, were granted to the plaintiff, to be by him enjoyed during the term of his lease. Under this contract and these several acts, it is clear, that the plaintiff is entitled to all the rights and benefits granted and conferred by act of 20th December, 1820, and is entitled to one half of any forfeiture incurred under the 4th section thereof, if such forfeiture be sued for by a common informer. He occupies the place and the stead of the city during his lease; he is possessed of all the rights that had been previously conferred on the city in reference to the water works ; and if a forfeiture is recovered by a common informer, entitled to the half that previously belonged to the City of Mobile. This is the obvious construction of the acts of 17th January, 1841, and of the 4th of February, 1846." This court, then, has solemnly decided, that Stein is entitled to the benefit of the act of 1841, confirming his agreement with the corporate authorities, and vesting in

him "its right, powers, privileges and immunities; and that he occupies the place and the stead of the city during his lease." If so, what are we to understand by the term immunity? "Immunity.—Exemption from any charge, duty, office, tax or imposition; a particular privilege."—Webster's Dictionary, "Immunity." Then, by the plain letter of the agreement, the water works are exempted from the payment of a tax or imposition, in the same manner as when held by the corporate authorities themselves. If it does not mean this, it means nothing, and it is useless to attempt by words to define rights.

But it is denied that the interest of Mr. Stein in the water works makes them real estate, and the acts authorizing the tax applies to no other. The able and accomplished jurist who argued the case for the defendants in error, defined the right of Mr. Stein in the water works to be an "incorporeal hereditament," which is thus described by Blackstone: "An incorporeal hereditament is a right issuing out of a thing corporate (whether real or personal) or concerning, or annexed to, or exerciseable within the same. It is not the thing corporate itself, which may consist in lands, houses, jewels, or the like—but something collateral thereto, as a rent issuing out of those lands or houses, or an office relating to those jewels."—2 Blackstone's Com., p. 12 (side page 19). Chief Justice Dargan, in the case of Lewis v. Stein, says it is a lease for twenty years. " The plaintiff (below) entered into a contract with the city authorities, by which he became the lessee of the water works for the term of twenty years."—16 Ala. 217. If then the interest which Mr. Stein by his contract with the city authorities acquired in the water works, is not that of an "owner of real estate," no taxes can be imposed on them, while held by him under his contract.

The third and last proposition viz: " Whether, if taxes can be imposed on the water works, Mr. Stein is liable for the same," has been necessarily considered in the discussion of the second. Without repeating the views presented, the following conclusions seem legitimately to follow from them: 1st. That the right of taxation for the benefit of private corporations, whether for public or private purposes, is not vested by the constitution of Alabama in the Legislature; that any act attempting to impose or collect such tax is unconstitutional and void. 2nd.

That the Mobile and Ohio Railroad Company is a private corporation, and those sections of the acts of the Legislature herein before set out which authorize taxes to be collected from the owners of real estate in Mobile, are not authorized by the constitution, and are absolutely void. 3d. That conceding the constitutionality of the said acts of the Legislature, the interest of Mr. Stein in said water works, is not that of an "owner of real estate"; and said interest is not liable to taxation. 4th. That if said water works are liable to taxation, such taxation must follow the ownership—and that being in the corporate authorities of the City of Mobile must (if the anomaly can be reconciled of a city taxing its own property) be paid by said corporate authorities.

DANIEL CHANDLER and ROBERT H. SMITH, *contra :*

Under the agreed statement of facts, the first and most important question to be decided is, Whether the act of the Legislature passed in December, 1852, in reference to the tax on the real estate of Mobile, for the Mobile and Ohio Railroad Company, is constitutional and may be enforced? The right of taxation is an incident of sovereignty, and the sovereignty of a State extends to every thing which exists by its authority, or is introduced by its permission. Every thing, then, that may be considered as constituting a part of the property within the State, may, in the wisdom of the Legislature, be taxed. The limitation on the exercise of this right rests on the interest of the legislators, and the influence of the people on their representatives to guard them against its abuse. Private property may be taken for public use in two ways, viz., by taxation, and by right of eminent domain. Taxation exacts money from individuals as contributions to any public burthen. Private property, taken for the public use by right of eminent domain, is not considered as the owner's contribution to a public burthen, but as so much beyond his share, and for which special compensation must be made. Taxation operates upon the community, or upon a class of the community, as in this case ; the exercise of the right of eminent domain operates upon an individual, without reference to any one else. In cases of taxation, the tax payer is always supposed to receive just

compensation in the protection which is extended to his life, liberty and property, and in the increased value of his possessions, arising from the use of the money raised by the tax. When money is thus raised and applied, no one can say that his "property has been taken and applied to public ' uses," and he has received no "just compensation" for it. His compensation is found in the sovereignty and laws of the State, which protect his personal rights and his private property ; and it is felt in the increased value of his property by the application of the money thus raised. Had the property been taken, not by taxation, but by right of eminent domain, then special compensation must be made to the value of his property.

The right of the Legislature to delegate the power of taxation to the constituted authorities of a city for local purposes, is well established by legislative precedents and judicial decisions. It will not be denied in this case. By the city charter, the corporation has power to establish markets, to erect bridges, to establish fire companies, hospitals, workhouses, to open streets, to levy taxes on real and personal estate within the city, and to do all acts that a majority of the corporation may deem requisite and necessary for the good government of the city, not contrary to the laws of the State. The interests of the city require the exercise of these powers. But, while it is conceded that the Legislature may authorize the corporate authorities of the city to do these and similar acts, it is denied, that it can give the corporation power to tax the property of its citizens to construct a railroad, that will greatly promote the prosperity of the city. The object of the road is not so much to benefit the stockholders, as to advance the interest and prosperity of the city, by increasing its commerce, its population, the value of its real estate, and by giving facilities of access and transportation to and from the city. The railroad is more important to the interest and prosperity of the city, than the opening of new streets, erecting bridges, establishing markets, fire companies, &c., for which taxes are imposed and paid without complaint or objection. To bring water in the city, that increases the comfort of the citizens, is admitted by all to be the legitimate exercise of a corporate power ; but to

bring trade to the city, that enhances its prosperity and wealth, is said to be unjust and unconstitutional. The Legislature did not think so, when they passed the act of 1852, The city authorities did not think so, when they sanctioned what the Legislature did, and immediately took the necessary steps to carry the act into effect. The legal voters of the city did not think so, when they consented that their property should be heavily taxed, in order that the road should be constructed.

In carrying into effect these acts of the Legislature, it must be borne in mind, that the rights of the defendant have not been violated or invaded. His property is taxed like that of other citizens, according to its valuation. The same men who assessed it, valued the property of all others.— There is no complaint of excessive taxation on his part—of injustice by a partial discrimination against his property : the only thing he complains of is, that his property is taxed without his consent. It is true, that the completion of the railroad will greatly enhance the value of his property, and as the population of the city increases, his income will be augmented : yet he wishes others to build the road for his benefit. His unwillingness to contribute to the completion of the road, has been shown in the only way in which it can be made available. He voted against the tax,—and there his opposition should end. Acquiescence in the decision of the majority, is now his duty. What right has he now to object, if the act of the Legislature has been sanctioned by the corporate authorities of the city, and been carried into effect by the voice of the people? It may be assumed, as a legal proposition well established, that the power of taxation may be delegated to the proper authorities of the city, and may be exercised and enforced against the will of minorities.

How is it to be ascertained whether any local measure will advance the interest and promote the prosperity of the city? is one man or the corporation to decide? is the minority or the majority to determine? are the courts or the Legislature to decide the question? It is the duty of the Legislature to decide whether any measure will advance the interests of the city. In this case, the right and power to

tax the property of the citizens of Mobile for a particular
purpose, was left, with the sanction of the corporation, to
the voters of Mobile: If the constitutional rights of the
defendant have not been violated by the acts of the Legisla-
ture, or by the corporation in executing them, the opinions
and wishes of the people must be carried into effect, against
the objections and opposition of Mr. Stein.   That the acts
of the Legislature authorizing this tax are constitutional, and
may be enforced, the following authorities show : Pamphlet
Acts 1852, p. 328 ;   Acts of 1850, p. 151 ;   24 Wend. 65 ; 9
B. Monroe 526 ;   17 Ala. 234 ;   9 ib. 234 ;   3 Gill 29 ;   4
Wheat. 428 ; 8 Leigh 120 ; 15 Conn. R. 475 ; 8 How. 82 ;
10 ib. 393 ;   4 Comstock 419 ; 9 Humph.  252 ; 11 Penn. R.
61 ; 3 Peters ; 9 B. Monroe 330 ; 2 vol. No. 1, Livingston's
Law Magazine, p. 28.

The second question presented for the decision of the court,
under the agreed statement of facts, is this : Do the water
works come within the provisions of the act of the Legislature,
and are they taxable under it ?   The act of 1852 authorizes
the corporate authorities to levy a tax on all real estate within
the limits of the city, of two per cent. per annum for five years,
&c.   The only question is, whether or not the water works can
be regarded as real estate ?   The agreed statement of facts on
this point is as follows : " The water is brought into the city by
means of cast iron pipes, of about eight inches bore, to a res-
orvoir within the city.   By means of said iron pipes, which are
buried about three or four feet under ground, the water is con-
ducted into the city, and along the streets ; and by means of
small lead pipes the water is carried from the main pipes under
ground, into the houses and lots of the citizens, who pay to
Stein stipulated prices therefor annually.   Under and by
authority of the Legislature, &c., a tax of two per cent. has
been levied on said water works, valuing the same at $75,000,
making a tax of $1,500, which they claim, and are enforcing by
proceedings directed by said act."   Under this statement, the
water, the reservoir, and the pipes constitute the water works,
and they are considered in law real estate, and are therefore
liable, under the act of 1852, to be taxed.—14 East Rep. 609 ;
10 Eng. Law & Eq. 374 ; 15 Adol. & Ellis, N. S., 377 ; 1
Barn. & Adolph. 113 ; 10 Adol. & Ellis, N. S., 218 ; 17 Ala.

240 § 2 ; 5 Barn. & C. 466 ; 5 B. & A. 156 ; 1 B. & C. 506 ; 3 Mason 464 ; 6 Greenl. 157 ; 20 Ohio 414 ; 17 Ala. 393 ; 2 Rh. Is. R. 15 ; 2 vol. No. 1. Liv. Monthly Mag., p. 30. The last of the above authorities considers the pipes laid in the streets of a city fixtures, and taxable as real estate without regard to ownership of soil.

If the water works are taxable under the act of 1852, the only other question, under the agreed case to be decided, is, whether Stein, the proprietor or lessee, is liable for said tax ? Being the owner of the land, reservoirs, pipes and privileges attached to them, and being in the possession and enjoyment of the same, he is liable to pay the tax. If he is not, who is ? The property is valuable ; it has to be protected, and the defendant derives from its use large annual revenues. The city authorities have passed ordinances to protect his rights, and to enable him to enforce them. His property, under the influence of these ordinances and this protection, and the belief that this road will be completed, is advancing rapidly in value. No one but himself, so far as these water works are concerned, participates in their profits and in their increasing value. It is a sound maxim, that "he who receives the advantage ought to sustain the burden." In this case he receives all the advantage, and his share of the burden ought to be cheerfully borne. 14 East 609; 1 Maul. & Sel. 507 ; 8 Adol. & Ellis, 78; Cowper 619.

CHILTON, C. J.—Three questions are presented by the record for our consideration :

1st. Did Mr. Stein, by the contract of lease, and the act of confirmation passed by the Legislature on the 11th of January 1841, secure an exemption from taxation upon his interest in the water works ?

2nd. Are the acts constitutional under which the tax now sought to be recovered, was levied ? and if so,

3rd. Do the water works described in the record come within the act taxing the owners of *real* estate ?

1. The first of these inquiries came substantially before us at a previous term, between these same parties, and we then held, "that the right to tax the property is not restricted nor impaired by the contract, and may lawfully be exercised." We have

reviewed the ground upon which that opinion rests, and are sat-
isfied with it.   Had the parties intended to secure so important
an exemption to the appellant, it is highly improbable that they
would have omitted to mention it in the contract ; and as there
is no provision contained in it, by which the right of the city to
impose the tax is taken away, we cannot presume an abandon-
ment of this right, and the yielding up of a power, on the part
of the city, so essential to its corporate existence, as that of
taxation for municipal purposes.   We rest this first proposition
upon the authority of the case above referred to (17 Ala. 234);
and proceed to inquire :—

2.  Whether the acts under which this tax was assessed, are
constitutional.   These acts may be thus stated :

The Legislature, having incorporated the Mobile and Ohio
Railroad Company, by an act passed the 3rd of February, 1848,
and having invested said company with the usual powers to car-
ry into effect its objects, authorized them to locate, construct,
and finally complete, a railway from some suitable point in the
City of Mobile, in a western or north-westernly direction, to the
west line of this State, towards the mouth of the Ohio River,
&c.—See act of 1847-8, p. 225.   Subsequently, by an act
to amend and explain the preceding one, passed the 5th of Jan-
uary, 1850, it was provided, "that for the purpose of facilita-
ting the construction of the road, the mayor, aldermen and
common council of the City of Mobile, be, and the same are
hereby, authorized to levy a special and separate tax upon the
real estate lying within the limits of said city, annually, until
the sum of three hundred thousand dollars is levied and paid to
the said Mobile and Ohio Railroad Company ; provided, how-
ever, that only twenty-five cents, upon every hundred dollars'
worth of property, shall be collected in any one year."

After making provision in the subsequent sections for assess-
ing and collecting said taxes by the city authorities, and for
the preservation of the names of the persons paying, with the
amounts paid, and for issuing certificates of stock to any per-
son who shall have paid one hundred dollars, &c., the seventh
section provides, that before the said corporation shall be enti-
tled to levy said tax, an election shall be held in said city, at
which none shall be entitled to vote, except the owners of free-
hold estates in said city, or tenants under lease for a term of

five years and upwards, and guardians who represent estates of wards, and requires the concurrence of three-fifths of the votes taken, in favor of the tax as provided by this statute.—See Pamph. Acts of 1849–50, pp. 150–1–2.

By a subsequent act, approved the 20th of December, 1851, the third section of the act of 5th of January, 1850, is so far modified, as to abolish the right to levy $300,000 by taxation, and, in lieu thereof, the city is invested, under a like restriction of first procuring the concurrence of three-fifths of the owners, &c., of real estate in its favor, of levying a tax of two per cent. per annum, on all the real estate in the city, for five years; authorizing all persons who had previously subscribed for stock, and who had paid more than twenty per cent. thereon to said company, to deduct the over-plus so paid from the tax to be' collected from them. This act contains other provisions, but they are not material in considering the question before us.

The required number of votes having been obtained in favor of the tax, the city was proceeding in its collection under the last named act, when the appellant, one of the tax payers who voted against the tax, and whose works for supplying the city with water had been assessed, raises the question as to the constitutional authority of the Legislature to invest the city with the power to levy it.

It is true, as stated by the appellant's counsel, that the constitution of the State does not mention the subject of taxation, except in the eighth section of the sixth article, which declares that "All lands liable to taxation in this State, shall be taxed in proportion to their value"; but the power to tax is an incident to sovereignty, and is said "to reside in government as a part of itself."—*Pr.* Marshall, C. J., in The Providence Bank v. Billings & Pittman, 4 Peters 415. In the formation of the State government, and the distribution of powers pertaining to it in its sovereign capacity, the *power to legislate* was conferred upon, and vested in, two distinct branches, the Senate and House of Representatives, together constituting the General Assembly of the State of Alabama. This department of the government, composed of the representatives of the people, elected by them to reflect their will, and to be influenced by their wishes, and amenable to them for an abuse of the trust reposed in them, does not depend for its power upon any specific provis-

ion of the constitution, pointing out the particular subject-matter with reference to which it may legislate. On the contrary, outside of those subjects which are excepted by the bill of rights, from the general powers of Government, the Legislature of the State, as respects all legitimate subjects-matter of legislation, is unrestricted, in virtue of its organization, except in so far as it is restrained by the State and Federal constitutions. The sovereignty of the State resides in the three departments upon which it has been conferred and distributed—the legislative, executive and judicial. To the first is entrusted the power of making new laws, to correct, repeal, or abrogate old ones ; to the second, the execution of these laws ; while to the third, it is reserved to make an application of them to particular facts, to determine differences which arise, to punish crimes, to try the validity of statutes by the standard of the constitution, and to protect each department of the government, and every individual in the community in the enjoyment of their chartered rights.—1 Kent 450.

Subject to the limitations above referred to, the power to levy taxes pertains to the legislative department of the government, which must determine the objects for which, and the manner in which, they must be levied, being responsible to their constituency for the proper exercise of that power.—8 How. 82.

We agree with the appellant's counsel, that the only legitimate object of taxation is, the support and maintenance of the government ; but, if by this support and maintenance they mean the expenses incurred by the mere machinery necessarily employed in its administration and conduct, we are not agreed in so restricting its sense. We think the power extends to the employment of all those means and appliances ordinarily adopted, or which may be calculated, to develop the resources of the State, and add to the aggregate wealth and prosperity of the citizens ; such, for example, as providing outlets for commerce ; opening up channels of intercommunication between different parts of the State ; improving the social, moral and physical condition of the people by wholesome police regulations, and by a judicious system of public instruction ; as also for the protection, security and perpetuity of our government and institutions. We would not, however, attempt to point out all the objects, nor prescribe the limits to which the power of taxation

extends ; the case before us does not demand this, but merely whether it is competent for the Legislature to delegate to the city authorities of Mobile the power to tax the owners of real estate, to aid in the construction of the Mobile & Ohio Railroad.

That the power to tax for *local* purposes may be thus delegated to municipal corporations, seems to be too well settled by the practice of our own and our sister States, and by numerous judicial decisions, to be considered an open question ; nevertheless, its importance has induced us to examine it with care.—— Perhaps there is not a county in the State, whose courts of roads and revenue have not, under the authority of legislative enactments, assessed and levied taxes for the erection of public buildings, bridges, and other public improvements within their respective limits. So, also, our statute books abound with enactments conferring upon civil corporations the right of taxation by means of by-laws ; and this delegation of power has been several times, if not expressly, at least incidentally, sanctioned by this court.

In Battle v. The Corporation of Mobile, 9 Ala. 234, the question came up as to the validity of a tax assessed by the city under the act of the Legislature of 14th of January, 1844 (Acts p. 175); and Mr. Justice Goldthwaite, in delivering the opinion, says : " The general question as to the delegation of the taxing power to civil corporations, is not disputed, and, indeed, has been several times decided by us in other cases"; and he cites Intendant of Marion v. Chandler, 6 Ala. 899 ; Estrabrook v. The State, *ib.* 653. True, the precise point does not appear to have been discussed in either of these cases ; but it underlies the decision in each of them. The several acts were regarded as valid, and must, therefore, have been esteemed constitutional.

In Talbot v. Dent, 9 B. Monroe 526, it was held, that an act authorizing the city of Louisville to subscribe for stock in a railroad company, and to pay for the same by taxation, the tax payers being entitled to certificates of stock, was not in violation of the constitution.

In the case of Nichol v. The Mayor of Nashville, 9 Hum. Rep. 252, an act of the Legislature of the State of Tennessee, which authorized the corporation of the City of Nashville to take stock in the Nashville & Chattanooga Railroad, and to

raise money by taxation to pay the subscription therefor, was held constitutional.—See also Hope v. Deaderick, 8 Hum. 1.

In The Commonwealth v. McWilliams, 11 Penn. Rep. (1 Jones) 61, a similar doctrine was sanctioned; and it was held, that an act, authorizing the supervisors of a township to subscribe for shares of the capital stock of a turnpike company, at the cost of the inhabitants of the township, was constitutional. The case of Parker v. The Commonwealth, 6 Barr 507, would seem to militate against the view here taken ; but, as restricted in the cases of The Commonwealth v. The Judges, &c., of Lebanon County, 8 Barr 391, and The Commonwealth v. Painter, 10 Barr 214, it is not opposed to the validity of the tax now the subject of controversy. It is worthy of remark, too, that the Congressional precedent of submitting the question of the retrocession of the County of Alexandria in the District of Columbia, to the State of Virginia, to the qualified electors of that country, which is relied upon in the last decision above referred to, would seem to conflict with the views taken in the case of Parker v. The Commonwealth. In the one, the vote of the county determined whether they were to remain a part of the District of Columbia ; in the other, whether they would have spirituous liquors retailed. Whether the latter can be regarded a violation of the constitution, is a question not now before us, and consequently we express no opinion on it.

The case of Goddin v. Crump, 8 Leigh 120, is in point. The City of Richmond was authorized by the Legislature of Virginia to borrow money to subscribe for stock in the James River & Kanawha Company, and to levy a tax to meet the payment. The question arose there, as it does in the case before us, whether the improvement of the James & Kanawha Rivers was to be regarded, with reference to that city, as a local purpose, by reason of the connection of those streams with its commerce and prosperity. It was held that it was, and the court sustain the law which authorized the tax.

So, also, in Maryland, in the case of Burgess v. Pue, 2 Gill's R. 19, the question came up, as to the right to recover a school tax, which had been voted by the taxable inhabitants of a school district. It was objected, that the act making provision for public institutions in primary schools throughout the State, was void, as being opposed to the constitution, by

reason of making its validity and operation in any county depend upon the votes of a majority of the voters of such county. The same arguments were urged in opposition to the law which are now insisted on; but the court held it no invasion of the constitution.

We have been favored with a paper containing the decision of the Supreme Court of Louisiana, in the case of The Police Jury, Right Bank of Parish of Orleans, v. The Succession of McDonough, decided in June, 1853, a case which, in all its leading features, is similar to the one before us, except, that there, a majority, instead of three-fifths, of the tax payers, could authorize the levying of the tax. The court, after a review of the principal authorities, sustain the tax. The reasoning of the court, in response to the objections to the law taken by the counsel, are so apposite to the case before us, that we deem it proper to quote a portion of the opinion. " It is said," says Slidell, C. J., delivering the opinion of the court, "that although the police jury might subscribe for stock for itself, it could not subscribe for stock for any one of the inhabitants in their individual capacity ; that the intent and effect of the law is, to force individuals to take and pay for stock in a railroad, whether they wish it or not,—whether they think the enterprise likely to be beneficial or not ; and that such a proceeding is mere spoilation for the benifit of a private corporation.

" This reasoning, and these assertions, misinterpret the purpose of the law, and involve a doctrine subversive of all taxation.

" The purpose of the law was, to enable political corporations to aid, by taxation, the completion of public improvements, which, it was supposed by the Legislature, would redound to their local advantage.

" The burden imposed was a tax, with regard to which each citizen has not a right to decide authoritatively for himself alone, whether the tax is for a useful purpose, and will redound to his individual advantage. If each citizen can be permitted to complain that his tax has been increased without his individual assent, and for a purpose which he individually disapproves, all government would be at an end.

" The will of a legal majority is not tyranny. It is the good

40

of the community to which we belong, which warrants a tax affecting our property. Of this public good, the Legislature, in taxation for general purposes, and the duly constituted local authorities, acting under the express will of the Legislature in a local sphere, and for local purposes, are the judges. The argument for the defendants confounds two distinct powers—the power of taxation, and the power of taking private property for public use. In the latter case, previous compensation must be made; in the former, though in taking a man's money for taxation you do take his property, the compensation is considered as simultaneously given, in the benefit which, as a citizen, he enjoys, in common with his fellow citizens, in the public welfare and the public prosperity, to the advancement of which the money is to be applied. Such is the theory of taxation. It may be abused, but its exercise cannot be judicially restrained, so long as it is referable to the taxing power;" citing Thomas v. Leland, 24 Wend. 69 ; 4 Peters 563.

In the case before us, the Legislature, doubtless, deemed that the benefits to accrue to the city would constitute a just compensation to those who contributed to build this road ; but, as the tax payers themselves, who reside in the city, are presumed to be more familiar with the proposed enterprize, and better able to judge of its probable results, as respects their interests, as a matter of caution and security to them, and as a safe-guard to the minority, *three-fifths* of them are required to concur.

We do not consider this as a delegation of the power of legislation to the people ; but it is a privilege conferred upon a municipal corporation, to be exercised conditionally—that is, in the event the requisite number of persons shall vote in favor of it. We see no difference, in principle, between allowing the corporation to levy the tax, provided three fifths of the taxable inhabitants shall vote in favor of it, and making the exercise of the power to defend upon any other feasible condition ; such, for example, as requiring three-fifths of the aldermen and common council to concur in levying it. We do not think the cases of Thorne v. Cramer et al., 15 Barb. Sup. Ct. R. 112, and Bradley v. Baxter, ib. 122, opposed to this view. In these cases, the question was not whether the Legislature possessed the power to invest a public corporation with authority to levy a

tax upon condition that a certain number of the subjects of the tax should assent to its being assessed, but whether it was competent for the Legislature to evade the responsibility of passing a law, by merely proposing it, and declaring that "the electors shall determine by ballot, at the annual election to be held in November next, whether this act shall or shall not become a law." This was a clear delegation of legislative power to the people, as respects a general law, and is, we think, clearly distinguishable from the delegation of authority to a corporation to do certain things upon the condition of first procuring the concurrence of the local inhabitants, whose interest alone is to be affected thereby. It will hardly be denied by any one, that the Legislature may constitutionally invest municipal corporations with the power of raising by taxation the means necessary for their existence and support by by-laws and ordinances operating upon the inhabitants within their respective local limits. If this power be denied, upon the idea that it is a delegation of the legislative functions, by parity of reasoning all authority to make by-laws and ordain police regulations must be denied, and thus no municipal corporation could exist for any beneficial purpose. Such, however, was not the design of the framers of the constitution. Such corporations, possessing similar powers, have existed from the earliest institution of political sovereignty, and have obtained in every civilized government. Indeed, history informs us, that they contributed largely in laying the foundation of liberty in modern nations.—Sir Jas. McIntosh's History of England, vol. 1, pp. 31, 32; Angell & Ames on Corp. 12.

Upon the whole, we see no objection, either as arising out of the constitution, or even as founded in public policy, to making the exercise of the power here conferred depend upon the expressed will of the taxable inhabitants. On the contrary, we esteem it a wise precaution, tending to enlist the vigilance of self interest as a protection against injustice and oppression.— The objection taken by the court, in the cases cited from 6 Barr and 15 Barb., that such enactments lacked the essential qualities of "command and prohibition," is, we think, plausible, but not solid. It is certainly not without the pale of State sovereignty to pass conditional laws, to grant franchises, or even to confer discretionary powers, with respect to which it would be absurd

to say they possessed the quality of either command or prohibition.

That the tax payers are made stockholders, is not a valid objection. They incur no additional liability, and their taxes are lessened in the proportion which the value of the stock bears to the amount which they pay. Nor is it a valid objection, that those who have paid over twenty per cent. may have the surplus deducted from the tax to be collected from them. The object was, as far as practicable, to equalize the burden, and to place those who had previously subscribed upon an equal footing with those whose taxes should secure them stock. The cases already referred to are sufficient to show, that the purpose for which this tax was authorized must be regarded, as respects Mobile, as local. That it extends beyond the city, and even without the limits of the State, is no objection to this view. The question is, has the city interest in its completion?—are the local interests of its inhabitants to be advanced, its real estate to be increased in value, its commerce augmented, its boundaries to be extended, its population increased, and its business generally to be enlarged, by the increased facilities of travel and intercommunication which the road will afford? The Legislature of the State, and a majority of three-fifths of its taxable inhabitants, have answered some or all of these question in the affirmative, by enacting and enforcing the tax; and it is not for the court to say that the decision which they have made is an unwise or impolitic one.

The removal of the bar in the James River above Warwick, although without the city of Richmond, was nevertheless a corporate act, as its effects would greatly redound to the interest of the city.—Goddin v. Crump, *supra*. The aqueduct which furnishes the water for the easement now taxed, has its commencement several miles out of the city; but will any one contend that its erection is not a corporate act? Certainly not. But it is useless to discuss the point further. Every one must concede the advantage which will result to a commercial city, from opening up a great thorough-fare for its commerce; and these advantages will, doubtless, more than compensate for the expenditure which the city will make towards the prosecution of the work. The certainty of the result, however, is a matter which the future alone can develop; the probabilities of its

successful issue can better be determined by those who have decided to bear the burden, in anticipation of the future benefits, than by this court. Thus much upon the constitutional question.

3. But it is argued, that Mr. Stein is not to be taxed for these water works, because they cannot be regarded as real estate. This proposition, like the one first noticed, is substantially covered by the previous decision of this court, in the case of Stein v. The Mayor &c. of Moble, 17 Ala. 234. If, however, the question was an open one, we should not hesitate to declare, that the easement should be classed as real estate.

The pipes are imbedded in the ground ; they lead from, and are connected with, the reservoir on the land of Stein. These pipes cannot be raised and severed from the land, without removing the soil; they are, therefore, clearly fixtures.—Gray on Fixtures 2; Gibbons' Law of Fixtures 15. That a portion of them run under the public streets by the license of the city, and that the reservoir is without the limits of Mobile, makes no difference. We must look to the nature of the works, and determine their character when viewed as a whole. The aqueducts, the reservoir, the land on which it is located, the pipes and appliances for conducting the water to the various houses, and its distribution, all connected, can with no piopriety of speech be called personal estate ; but the materials, thus united, are fixtures, and the exclusive right to vend the water, as predicated upon this combination, is an easement or franchise, incorporeal, yet partaking of the nature of the subject-matter to which it is attached, and is therefore properly classed as real estate.

In The Providence Gas Company v. Thasher, 2 Rhode Isl. R. 15, it was held, that pipes laid in the streets of a city by a gas company, under a grant in their charter, are fixtures, and taxable as real estate. The court said, with respect to the right which the company took under their charter, "we , think, when exercised, it is an easement ; an incorporeal hereditament, like the right of a railroad company to build and occupy their road, or a canal company their canal, under the provisions in their charter."

We are of opinion, that Mr. Stein, being the owner of this franchise for twenty years, and in perpetuity unless redeemed by the city after that period, and sole recipient of the profits aris-

ing from these works for the term mentioned in his lease, as confirmed by the act of the Legislature, should be held responsible for the taxes, having made no provision against his liability in his contract with the city, and securing no exemption in the law which confirms his lease.—13 Penn. R. 322 ; 11 Iredell 624. Whether he has not been over-assessed, is a question not brought before us, and one on which we express no opinion.

Without extending this opinion farther by a citation of the various authorities, most of which will be found on the briefs of the counsel, and which we have examined, we conclude that there is no error in the record, and the judgment is consequently affirmed.