## GIBBONS *vs.* MOBILE & GREAT NORTHERN RAILROAD CO.

[BILL IN EQUITY TO ENJOIN COLLECTION OF TAX LEVIED BY MUNICIPAL CORPORATION IN AID OF RAILROAD.]

1. *Constitutionality of statute authorizing municipal corporation to aid railroad company.*—The act of February 8th, 1858, "to authorize the corporate authorities of the city of Mobile to aid in the construction of a railroad, upon a vote of the citizens," (Session Acts 1857–8, p. 165,) and the act supplemental thereto, approved November 29, 1859, (Session Acts 1859–60, p, 294,) are not violative of any constitutional provision; being neither an illegal exercise of the taxing power, nor a taking of private property without just compensation.

2. *Validity of contract between corporate authorities of Mobile and Great Northern Railroad Company, as affected by failure to comply with terms of act of 1858.*—The said act of 1859 having expressly empowered the corporate authorities of Mobile to aid in the construction of the Mobile and Great Northern railroad, by virtue of the vote of the citizens taken under the said act of 1858, the failure of said corporate authorities, in taking the vote of the citizens, to comply with the terms of the said act of 1858, does not affect the validity of their contract with said company.

3. *Same, as affected by fact that city bonds, with interest, exceed amount of aid authorized by said act.*—Nor is the validity of said contract affected by the fact, that the aggregate amount of the bonds issued by

said corporate authorities, with the interest thereon accruing up to the time when they respectively fall due, exceeds one million of dollars, the sum specified in said acts as the maximum of aid to be extended to said railroad company.

4. *Same, as affected by failure to reserve stock for accruing interest on bonds.* Nor is the validity of said contract at all impaired by the failure to require stock in said railroad company to be issued to the assignee or appointee of the city, for the interest it may pay on said bonds.

5. *Same, as affected by levy of tax for payment of bonds.*—Although said acts of 1858 and 1859 only authorized said city authorities to aid said railroad company in one of two ways—*i. e.*, either by direct taxation, or by the issue of city bonds, as might be determined by the vote of the citizens—and not in both ways; yet said city authorities were thereby clothed with the implied power, in the event that the citizens voted in favor of the issue of bonds, to levy a special tax to provide for the payment of the bonds, with interest, as they fell due; and this, moreover, was expressly enjoined on them as a duty by the 13th section of the act of 1843, (Session Acts 1842–3, p. 116.)

6. *Same, as affected by failure to comply with provisions of 9th section of said act of 1843.*—The 9th section of said act of 1843, prohibiting said corporate authorities of Mobile from borrowing money, or creating new debts, "for purposes of profit or improvement," without the unanimous vote of the boards of aldermen and common council, at a full meeting, concurring with the mayor, is expressly reserved from repeal by the act of 1844, "to consolidate the several acts of incorporation of the city of Mobile, and to alter and amend the same," (Session Acts 1843–4, p. 191, § 48,) and is not repealed, or in any manner impaired, by said acts of 1858 and 1859, above cited; nor is said section confined in its operation to the powers which said city authorities were then authorized to exercise. But the issue of bonds under the contract with said railroad company is not, within the meaning of said section, the creation of a new debt "for the purpose of profit or improvement;" consequently, the validity of said contract is not affected by the fact that it was not made at a full meeting of both said boards, and with the unanimous vote of all their members.

7. *Same, as affected by 16th section of said act of 1843, prohibiting contracts between said corporate authorities and individual members.*—Since the contract with said railroad company does not require or authorize any member of the board of aldermen or common council to do any work or perform any service for said corporate authorities, the 16th section of said act of 1843, prohibiting contracts for work or service between said corporate authorities and the individuals composing either board, has no application to the case.

8. *Same, as affected by official oath of corporate authorities.*—If said

Gibbons v. Mobile & Great Northern Railroad Co.

contract be a violation of the official oath, as prescribed by the 7th section of said act of 1844, of those aldermen and common councilmen who were at the time stockholders in said railroad company; yet, since the statute does not declare the prohibited act void, nor impose a penalty for its violation, the contract is nevertheless valid in law.

9. *Same, as affected by public policy.* —The fact that several of the aldermen and common councilmen were, at the time said contract was entered into, stockholders in said railroad company, does not, *per se,* invalidate said contract.

APPEAL from the Chancery Court of Mobile.

Heard before the Hon. MILTON J. SAFFOLD.

THE bill in this case was filed by Lyman Gibbons and others, on behalf of themselves and all other tax-payers of the city of Mobile who might come in and contribute to the expenses of the suit, against the Mobile and Great Northern Railroad Company, the corporate authorities of the city of Mobile, and the city tax-collector; and sought to cancel and annul a contract, which had been entered into between said corporate authorities and said railroad company, and which is hereinafter set out, and to perpetually enjoin the collection of a tax, which said corporate authorities had levied to pay the city bonds issued under said contract. The said railroad company was incorporated by an act of the legislature of this State, approved February 15, 1856; and its charter was afterwards amended, by allowing it a longer time to complete the construction of its road, by an act approved February 8, 1858.—See Session Acts 1855–6, p. 278; *ib.* 1857–8, p. 163. The contract sought to be canceled and annulled was in the following words:

"This contract, made and agreed upon this — day of December, 1859, by and between the Mayor, Aldermen and Common Council of the city of Mobile, of the one part, and the Mobile and Great Northern Railroad Company, a company chartered and incorporated by an act of the legislature of the State of Alabama, approved on the 15th day of February, 1856, of the other part, *witnesseth,* That, whereas the Mayor, Aldermen and Common Coun-

cil of Mobile, under and by virtue of two certain acts of the legislature of the State of Alabama, approved respectively, on the 8th February, 1858, and on the — day of November, 1859; and by virtue of the vote of the people of the city, taken on the 21st day of March, 1859, are fully authorized and empowered to aid in the construction of the Mobile and Great Northern railroad, by the issuance of the bonds of said city, for an amount not exceeding one million of dollars, under such contract with said Mobile and Great Northern Railroad Company as said city authorities may agree upon: Now, the said Mayor, Aldermen and Common Council of Mobile, under and in pursuance of the authority aforesaid, have contracted and agreed, and do hereby contract and agree, to and with said Mobile and Great Northern Railroad Company, to aid said company in the construction of their said railroad, to the extent, and in the manner, and upon the terms, covenants and stipulations in the following articles mentioned:

"*Art.* 1. The said Mayor, Aldermen and Common Council of Mobile have agreed, and do hereby agree, to issue and deliver to said Mobile and Great Northern Railroad Company, on or before the 2d day of January next, or as soon thereafter as practicable, one million of dollars of their bonds; said bonds to be properly made and executed under the seal of the city of Mobile, payable at the Merchants' Bank of New York, in the city of New York, to the order of the Mobile and Great Northern Railroad Company—that is to say, one thousand bonds of said city of Mobile, for the sum of one thousand dollars each, bearing date the 31st day of December, 1859, and to become due and payable at the dates and times mentioned in the second article of this contract; bearing interest at the rate of eight per cent. *per annum*, payable semi-annually, on the first days of January and July of each year, until the maturity of said bonds; for which interest, proper coupons shall be attached to each bond; which coupons shall be made payable in the city of Mobile, or New York, or Charleston, as may be designated in the same by said railroad company, as hereinafter provided.

"*Art.* 2. The said Mayor, Aldermen and Common Council covenant and agree with said Mobile and Great Northern Railroad Company, that said bonds, so to be issued by said city authorities, shall be so worded and expressed as to make the same payable at the times and dates following—that is to say:

15 of said bonds shall be made payable on 1st Jan. 1861;

| | | | | |
|---|---|---|---|---|
| 16 | " | " | " | 1st Jan. 1862; |
| 17 | " | " | " | 1st Jan. 1863; |
| 18 | " | " | " | 1st Jan. 1864; |
| 20 | " | " | " | 1st Jan. 1865; |
| 21 | " | " | " | 1st Jan. 1866; |
| 23 | " | " | " | 1st Jan. 1867; |
| 25 | " | " | " | 1st Jan. 1868; |
| 27 | " | " | " | 1st Jan. 1869; |
| 29 | " | " | " | 1st Jan. 1870; |
| 31 | " | " | " | 1st Jan. 1871; |
| 34 | " | " | " | 1st Jan. 1872; |
| 37 | " | " | " | 1st Jan. 1873; |
| 40 | " | " | " | 1st Jan. 1874; |
| 43 | " | " | " | 1st Jan. 1875; |
| 46 | " | " | " | 1st Jan. 1876; |
| 50 | " | " | " | 1st Jan. 1877; |
| 54 | " | " | " | 1st Jan. 1878; |
| 58 | " | " | " | 1st Jan. 1879; |
| 63 | " | " | " | 1st Jan. 1880; |
| 68 | " | " | " | 1st Jan. 1881; |
| 73 | " | " | " | 1st Jan. 1882; |
| 79 | " | " | " | 1st Jan. 1883; |
| 85 | " | " | " | 1st Jan. 1884; |
| 28 | " | " | " | 1st Jan. 1885. |

"*Art.* 3. Whereas the said railroad is designed and intended to promote and sustain the general benefit and business of the city of Mobile, and of all the citizens thereof, the said Mayor, Aldermen and Common Council have agreed, and do hereby agree and contract with said railroad company, that they will annually, from and after the first day of January, 1860, provide the sum of ninety-five thousand dollars, until the said railroad company shall be able, as hereinafter mentioned, to provide from

the net surplus earnings of said road a like sum of ninety-five thousand dollars; said sum to be applied to the payment of said bonds in their proper order, as the same shall become due, and to the payment of the coupons attached to such of said bonds as may be unpaid, whether sold, or in the possession of said company; and said Mayor, Aldermen and Common Council agree and bind themselves, that they will, under and in pursuance of said acts of the legislature of the State of Alabama, adopt such by-laws and resolutions as may be necessary and proper for the levy and collection, by a special tax, of said sum of ninety-five thousand dollars, until said railroad company shall be able, from the net surplus earnings of said road, to provide a like sum, as before mentioned, and hereinafter more fully expressed; and the said sum shall be by them annually, from and after the first day of January, 1860, during the time aforesaid, so levied, collected and applied to the payment of said coupons and said bonds, as aforesaid, in the manner following—that is to say, the said sum, as the same may be collected by the tax-collector or other proper officer, shall be placed as a special deposit in the Bank of Mobile, to be by said bank applied to the payment of said coupons and bonds, as the same may mature or become due; and said corporate authorities agree and bind themselves, to provide and pay to said bank such further sum as said bank may charge as exchange for the payment of said coupons and said bonds.

"*Art.* 4. It is mutually agreed, by and between said parties hereto, that for all of such bonds as may be redeemed or paid by said Mayor, Aldermen and Common Council, as mentioned in the preceding article, the said railroad company shall issue a like amount of the capital stock of said company, to any person or persons to whom said corporate authorities may direct such stock to be issued; it being deemed best that the capital stock of said company shall be and remain in the hands of individuals, rather than in the hands of the corporate authorities of said city.

"*Art.* 5. The said Mobile and Great Northern Railroad

Company covenants and agrees with the said Mayor, Aldermen and Common Council, that said bonds shall be sold and disposed of to the best advantage, and at the highest rate that can be obtained for the same; and that the proceeds arising from such sales, and all funds derived from said bonds before the sale thereof, together with all funds derived from the subscriptions for capital stock in said company, shall be faithfully applied to the construction and equipment of said road. And said company further covenants and agrees, that the whole of the net surplus earnings of said road, and all other funds of said company, however raised or derived, shall be applied to the completion of said road and the equipment thereof, until the construction account and the account for the first efficient equipment thereof can be properly closed and paid, in pursuance of the terms and stipulations of this agreement, hereinafter provided in the eighth and ninth articles of this contract.

"*Art.* 6. It is understood and agreed, by and between the parties hereto, that said railroad company, or any properly authorized agent of said company, for the purpose of aiding in the sale of said bonds, may fill up the coupons attached thereto, so as to make the same payable at the Bank of Mobile in Mobile, at the Merchants' Bank of New York in New York, or at the Bank of Charleston in Charleston; and due notice shall be given to said corporate authorities of all sales of said bonds, to whom sold, and at what rates, and the amount of said coupons made payable, as aforesaid, at either of said places before named.

"*Art.* 7. The sole object and intention of said corporate authorities of Mobile, in undertaking to aid said railroad company in the construction and equipment of said road, being to bring as much of the trade, traffic and business passing over the same as may be practicable within and to the city of Mobile, it is agreed and understood, that the southern terminus and depots of said road shall be within said city, west of the Mobile river; and there shall, at no time after the final completion of said road, be located or established on the line thereof, outside

of the limits of said city, any depot or place of public business, within five miles of the navigable waters emptying into the bay of Mobile; *provided*, said company may receive and discharge any and all materials that may be necessary for the construction and maintenance of the road, at any point or points on the line of said road. And said railroad company covenants and expressly agrees with said corporate authorities, that there shall not, from and after the first day of January, 1863, be continued, established, or kept up, any depot, station, or place of public business of said railroad company, at or on the east bank of the Tensas river, (whether said road may be in operation and running into said city, or not, on the first day of January, 1863,) without the express assent of the said corporate authorities to the further continuance of such depot or place of business.

"*Art.* 8. The said Mobile and Great Northern Railroad Company covenants and agrees with the said Mayor, Aldermen and Common Council, that after full payment of all debts and liabilities of said company (other than the liabilities of said company to the corporate authorities of Mobile by reason of the premises) that may be made and contracted by said company for the building, completion, and first efficient equipment of said road, (including the warehouses, depots, and station buildings, and repair and construction shops requisite for the business thereof,) the said company, after keeping said road in good repair and sufficient equipment for its efficient operation, shall and will, annually thereafter, provide a like sum of ninety-five thousand dollars, to be applied to the payment of said coupons and bonds, as the same may become due; and the said sum shall be placed by said company as a special deposit in the Bank of Mobile, as the same may be earned by said road, to be applied by said bank to the payment of said coupons and bonds as the same may become due as aforesaid; and said railroad company further agrees to provide and pay to said bank such further sum as said bank may charge as exchange for making said payments; *provided*, the net surplus earnings of said road, after keeping the same in

good repair and efficient operation as above mentioned, shall be sufficient for the payment of said ninety-five thousand dollars annually and said exchange to said bank as aforesaid. But, should the net surplus earnings of said road not be sufficient to pay said sum of ninety-five thousand dollars annually and said exchange to said bank, then, and in such case, the whole surplus earnings of said road shall be paid over to such person or persons as said corporate authorities may, by resolution duly passed and approved, direct, to be applied to the payment of said coupons and bonds.

"*Art.* 9. It is mutually understood and agreed, between the parties hereto, that the construction account, and the account for the first efficient equipment of said railroad, shall be closed whenever, in the opinion of the chief engineer of said company, said road is properly built and equipped for the efficient operation thereof; and in case the said corporate authorities of the city of Mobile shall not be satisfied with the opinion of said chief engineer, and in case the parties hereto shall be unable to agree when said accounts shall be closed, these questions, or either of them, shall be referred to two civil engineers, one of whom shall be chosen by each party; and in case the persons thus selected shall be unable to agree, they shall select a third person, and the award of any two of the persons so chosen shall be binding and final.

"*Art.* 10. Inasmuch as the corporate authorities of the city of Mobile will have a direct interest in having the means arising from the sale of said bonds, and all other means of said railroad company, faithfully and properly applied to the building and equipment of said railroad, and will have a continued interest in the administration of the affairs and funds of said company, until the maturity and payment of said bonds, said company agrees and binds itself to render to said corporate authorities a full statement, annually, of the application of all the means thereof; and further, that their books and accounts shall at all times, until the maturity and payment of said bonds, be open to the examination of the mayor, or of

any person he may appoint to examine the same, for the information of said corporate authorities.

"*Art.* 11. The said Mobile and Great Northern Railroad Company agrees and covenants with the said Mayor, Aldermen, and Common Council of Mobile, that said railroad shall be built as speedily and as rapidly to the completion thereof as may be practicable, having due reference to the best interests of said railroad company and of said city of Mobile.

"*Art.* 12. The said Mayor, Aldermen and Common Council of Mobile covenant and agree with said railroad company, that the said road, and any lands the said railroad company may acquire or hereafter own, within the limits of said city, for depots, stations, warehouses or workshops, shall continue to be assessed and taxed by said corporate authorities, at the present assessed value of said lands, wheresoever situate in said city; and that no greater tax shall be levied or collected on said road or such lands, by reason of any depots, depot-buildings, warehouses, or work or repair-shops, being erected on the same by said railroad company, until said railroad shall pay or divide a dividend among the stockholders thereof.

"*Art.* 13. The Mobile and Great Northern Railroad Company agrees and covenants, that said company shall and will, whenever required by said Mayor, Aldermen and Common Council of Mobile, make and execute, under the proper seal of said company, a deed of trust to such person or persons as said corporate authorities may name, of all the property and effects of said company which it may purchase or acquire by reason of any funds derived from the sale of said bonds, or from subscriptions to the capital stock, or the earnings of its road, in order to secure to said corporate authorities the faithful performance of all the stipulations and covenants to be done and performed on the part of said railroad company according to the terms of this contract; and which said deed shall recite this contract, and be so drawn as to give to said trustees, in case the said company shall fail for two years to perform the covenants and stipulations of

this contract on its part, the power to seize and take possession of all the property so conveyed, when directed to do so, by resolution duly passed and approved, by the said corporate authorities, and the same to sell to the highest and best bidder, upon giving four months notice, by publication in one or more of the newspapers published in the city of Mobile, and such other notice as said trustees may think proper and expedient, of the time and place of such sale, and upon such terms as to payment as the said parties hereto may agree upon; *provided*, said corporate authorities should prefer to have said road, with its said property and equipments, so sold and disposed of, rather than to take the net surplus earnings of said road, to be paid over to them as hereinbefore provided. *Provided*, it is expressly understood and agreed, that the said company shall have the right and power to create a lien or liens superior to, and to take precedence of, any rights of said city under this contract, or any lien created or deed of trust executed in pursuance hereof, by a mortgage or mortgages of said road and all its property and effects, and of the income and earnings thereof, to the extent of three hundred thousand dollars, for the purpose only of enabling said company, by the aid of such funds arising from such mortgage or mortgages, more efficiently to proceed with the construction, building and equipment of said road.

"*Art.* 14. It is mutually understood and agreed, between the parties hereto, that in case any variance or dispute should hereafter arise between them, as to the proper construction of this contract, or of any article or part thereof, or any other variance or dispute growing out of the respective obligations of one party to the other under the terms and stipulations of this contract, other than the questions a mode of settlement of which is provided in the ninth article of this contract, all such questions or disputes shall be referred to two competent persons, one to be selected by each of the parties hereto; and in case the persons thus selected shall be unable to agree, they shall select a third person, and the award of any two of the persons so chosen shall be final and binding.

" This contract shall be binding and obligatory on the said Mayor, Aldermen and Common Council of Mobile and the said Mobile and Great Northern Railroad Company, whenever it shall be adopted and ratified by proper resolutions duly passed by the boards of aldermen and common council, approved by the mayor, and adopted and ratified by resolutions duly passed by the board of president and directors of said Mobile and Great Northern Railroad Company; and this contract, when so adopted and ratified, shall be signed by the mayor of said city, and properly attested under the seal of the Mayor, Aldermen and Common Council of Mobile, and shall be signed by the president, and properly attested under the seal of the said Mobile and Great Northern Railroad Company."

(Signed and attested, as above prescribed, on the 27th December, 1859.)

The acts of 1858 and 1859, referred to in the foregoing contract, are in the following words:

" *An Act to authorize the corporate authorites of the city of Mobile to aid in the construction of a railroad upon a vote of the citizens.* Approved February 8, 1858.

" Section 1. *Be it enacted by the senate and house of representatives of the State of Alabama, in general assembly convened,* That the corporate authorities of the city of Mobile shall have authority to aid in the construction of a railroad north-eastwardly from the city of Mobile, either by taxation upon all property subject to taxation, at a rate not exceeding two per cent. *per annum*, for five years, or by the issue of city bonds, for an amount not exceeding one million dollars, under such contract with the company to be aided as the said city authorities may agree upon ; *provided*, that before such tax shall be levied, or such bonds shall be issued, they shall submit to a vote of the persons subject to be taxed, under such regulations as they shall deem just and proper, the questions, whether such railroad shall be so aided, what railroad company shall be so aided, [and] by what means—taxation, or bonds ; and the said corporate authorities shall be gov-

erned by the vote of the persons above specified on these questions, and may pass such ordinances as may be necessary to carry out the true intent and meaning of this act."

"*An Act supplemental to, and in enlargement of, ' An Act to authorize the corporate authorities of the city of Mobile to aid in the construction of a railroad upon a vote of the citizens,' approved February 8th*, 1858. Approved November 29, 1859.

"SECTION 1. *Be it enacted by the senate and house of representatives of the State of Alabama, in general assembly convened*, That the vote of the people of the city of Mobile, taken on the 21st March, 1859, under an act of the legislature of Alabama approved the 8th February, 1858, entitled ' An act to authorize the corporate authorities of the city of Mobile to aid in the construction of a railroad upon a vote of the citizens,' shall be sufficient authority to the corporate authorities of said city of Mobile, and they are hereby authorized and empowered to aid in the construction of the Mobile and Great Northern railroad, by the issuance of the bonds of said city, for an amount not exceeding one million dollars, under such contract with said Mobile and Great Northern Railroad Company as said city authorities may agree upon.

" SECTION 2. *Be it further enacted,* That the corporate authorities of said city of Mobile shall have, and they are hereby invested with, power and authority to adopt such by-laws and resolutions, and to provide such ways and means, and to do such acts as shall be necessary and proper for the full execution and performance of such contract as they may make with said Mobile and Great Northern Railroad Company, under and by virtue of this act and the one to which it is an amendment and supplement.

" SECTION 3. *Be it further enacted*, that all laws and parts of laws, inconsistent [with] and contrary to this act, be, and the same are hereby repealed."

The ordinance of said corporate authorities of Mobile, under which the tax sought to be enjoined was levied, is

entitled · " An Ordinance to provide for the payment of the railroad bond debt;" and, after reciting the provisions of said acts of 1858 and 1859, above copied, and the stipulations of said contract with the railroad company, contains the following provisions.

"SECTION 1. *Be it ordained*, That under and in pursuance of said acts of the legislature of the State of Alabama, and in pursuance of the terms, stipulations and agreements of said contract with said railroad company, · there shall for the year 1860, and annually thereafter, be levied and collected a special and separate tax upon the assessed value of all taxable property in the city of Mobile, in addition to the tax now authorized to be collected; and a court of assessment, composed of the mayor and presidents of the boards of aldermen and common council, shall annually fix the rate and per cent. of such tax; which shall be at such rate as will raise and secure the said sum of ninety-five thousand dollars annually, and such sum as will be sufficient to pay such exchanges as may be charged by said Bank of Mobile for the payment of said coupons and bonds.

" SECTION 2. *Be it further ordained,* That there shall be opened on the books of the treasurer an account, to be known and styled as the railroad-bond-debt account ; and the said account shall be credited with all moneys deposited by the city tax-collector in the Bank of Mobile, as hereinafter provided for; and said account shall be debited with all bonds and coupons, as they are paid and returned to his office, making annual reports of the same.

" SECTION 3. *Be it further ordained,* That the said taxes, to be raised under the authority of this ordinance, and of the aforesaid acts of the legislature, are hereby pledged to the payment of said bonds and the interest coupons thereto attached, as the same may become due ; and it is hereby made the duty of the city tax-collector and his successors in office, to deposit weekly in the Bank of Mobile, to the credit of said railroad bond debt, all moneys which he may collect under the authority of this ordinance and of said acts of the legislature, save and except such amount of commission as he may be allowed

by this ordinance, which amount said tax-collector is hereby authorized to deduct from his weekly deposits in said Bank of Mobile; and it shall be the duty of said tax-collector to make weekly returns, or reports, of all moneys so collected by him, to the boards of aldermen and common council; and it shall be the duty of the treasurer of the city of Mobile to have semi-annual settlements with said bank, of all moneys so deposited by the tax-collector, and of all payments made by said bank on account of said bonds and coupons; and the said bank is hereby fully authorized and empowered to pay from the deposit made under this ordinance all of said coupons for interest on said bonds as they mature, and cancel the same forthwith, and return the same upon settlement to the city treasurer; and said bank shall keep account of the deposits and payments made out of said special fund.

"SECTION 4. *Be it further ordained,* That said special tax shall be so annually levied, collected, and applied to the payment of said coupons and bonds, until the said railroad company shall be able to provide the requisite sum of ninety-five thousand dollars annually, from its net surplus earnings, and to pay the amount charged by the Bank of Mobile as exchange, in pursuance of the stipulations of said contract.

"SECTION 5. *Be it further ordained,* That the city tax-collector, before proceeding to the collection of said special tax, shall give bond, payable to the Mayor, Aldermen and Common Council of Mobile, with two sufficient sureties, in the sum of thirty thousand dollars, for the faithful performance of the duties imposed upon him by this ordinance; and shall receive as compensation for the performance of the same one per cent. upon the amount of his collections."

The bill alleged, that the vote taken on the 21st March, 1859, under the direction of said corporate authorities of Mobile, was not taken in conformity with the requirements of said act of 1858, inasmuch as all persons were allowed to vote who were entitled, under the laws of the

city, to vote for mayor; that under the contract between said corporate authorities and said railroad company, the former have issued city bonds, as specified in said contract, to the amount of one million dollars, exclusive of interest, and have delivered said bonds to said railroad company, who holds them as a debt against the city, and have levied a tax of 35-100 of one per cent., on all property subject to taxation within the city limits, to pay the sum which, under the provisions of said contract, they agreed to pay for the year 1860; that at the time this contract was made by said corporate authorities, there was not a full attendance of both boards, as required by the ninth section of the act of 1843, hereinafter referred to, but there was one vacancy, one member of each board was absent, and there was one dissenting vote in each board; that twenty-one out of the twenty-eight persons composing said two boards, were at the time stockholders in said railroad company; that said contract insures the completion of said railroad, thereby enhancing the value of the stock, and otherwise benefiting the individual stockholders, while it creates a large debt against the city without any consideration, and imposes a heavy burden on the tax-payers, without any corresponding benefit. The complainants charged, that said acts of 1858 and 1859 were unconstitutional; and that said contract was without consideration, was illegal, and void on grounds of public policy; and prayed that the contract might be annulled, the bonds canceled, and the collection of the tax perpetually enjoined.

The act of 1843, above referred to, is the act approved February 11th, 1843, entitled "An act to enable the corporate authorities of the city of Mobile to provide for the security and payment of the debts of said city, and for other purposes."—Session Acts 1842-3, p. 113. The case also involves the construction of some provisions of the act approved January 15, 1844, entitled "An act to consolidate the several acts of incorporation of the city of Mobile, and to alter and amend the same."—Session Acts 1843-4, p. 175. As the material portions of both these acts are quoted at length in the subjoined briefs of coun-

28

sel, and in the opinion of the court, it is unnecessary to repeat them in this place. The acts of 1858 and 1859, above copied, the acts incorporating said railroad company and amending its charter, the contract between the corporate authorities of Mobile and said railroad company, and the city ordinance providing for the payment of the bonds, were all made exhibits to the bill.

. Separate answers were filed by said railroad company and said corporate authorities, which were, however, substantially the same. Each admitted all the allegations of the bill, as to the facts connected with the contract; but denied all its charges, as to the validity of the contract, the constitutionality of the laws under which said contract was made, and the legality of the tax. The legal points presented by the answers are stated in the briefs of counsel.

The chancellor dissolved the injunction, on motion, after the filing of the answers; and his decree is now assigned as error.

The cause was argued at the bar, and printed argument were also submitted, by E. S. DARGAN, P. HAMILTON, and JOHN T. TAYLOR, for the appellants; and by R. H. SMITH, A. R. MANNING, and ANDERSON & BOYLES, for the appellees. The limits of a report admit only of the publication of a condensed statement of the points and authorities presented on each side.

*Points and authorities for the appellants.*

1. The city authorities of Mobile had no general power, as a municipal corporation, to make the contract and levy the tax here complained of.—City Council of Montgomery v. M. & W. Plank-road Co., 31 Ala. 76. If said contract and tax can be sustained at all, it must be under the authority conferred on said municipal authorities by the acts of 1858 and 1859.

2. The contract is not warranted by said acts of 1858 and 1859. The answers admit, that the vote taken under the act of 1858, not being confined to the persons subject to be taxed, did not conform to the requirements of said act; and that no contract with the railroad company

Gibbons v. Mobile & Great Northern Railroad Co.

was made under that act; and they rest the validity of said contract on the act of 1859. The act of 1858 conferred (or was intended to confer) the power to aid the railroad company, *either* by taxation, *or* by the issue of bonds, as might be determined by a vote of the citizens; while the act of 1859 repeals the power to aid by taxation, and, like the former act, limits the aid to be extended by bonds to one million dollars. In both of these particulars, the contract violates provisions of the act of 1859. Although the nominal amount of the bonds is only one million, yet the interest to be paid on the coupons swells the aggregate of the city obligations to two millions three hundred and seventy-five thousand dollars. As obligations to enforce the payment of money, coupons are equally as binding as bonds, and may be reduced to judgment in the same manner. Express power to raise one million dollars of bonds, certainly cannot include an implied power to issue more than that amount of other obligations in addition thereto; and such implied power is not to be assumed from inference and construction. 7 Amer. Law Register, 725; 8 *ib.* 271. The same objection applies to the provision of the contract binding the city to the payment of exchange on coupons and bonds; and in a greater degree, because the statute gave no authority to provide for payment in New York, or elsewhere than in Mobile. Although taxation was repudiated by the vote of the citizens, and the power to tax was repealed by the act of 1859; yet this contract imposes on the tax-payers an onerous amount of taxation, for a period five times as great as that authorized by the former act of 1858. To say that taxation is necessary to give value and character to the bonds, and that the city has no means of payment other than by taxation, is no answer to this objection, but simply shows the error in the construction of the acts adopted by the city authorities. The true construction of said act, whether considered by itself alone, or in connection with the act of 1858, is simply this—the city authorities were authorized *to loan* the credit of the city to the railroad company to the extent of a million dollars. *To aid,* is to assist, to stand by and sup-

port; not to give, to become parcel of, or incorporated with. The term *aid*, as applied to railroads, has a settled legislative meaning in this State, and is synonymous with loan.—See Session Acts 1851-2, p. 209; *ib.* 1853-4, p. 36; and other similar acts.

3. If said contract and tax be in perfect accordance with the provisions of the act of 1859, they are nevertheless illegal, because they are violative of several provisions of the act of 1843.—Session Acts 1842-3, p. 113. The 9th section of said act of 1843 declares, that the corporate authorities of Mobile shall not thereafter "be permitted to purchase real estate, or borrow money, or create any new debt, for purposes of profit or improvement, without a concurrence of the mayor and boards of aldermen and common council, at their regular meetings, upon a full attendance of all the members of both boards, at a time when there shall be no vacancy in either, and none dissenting to the act;" and further, "that any contract, made in violation of this act, shall be wholly null and void." The answers in this case admit that, at the time said contract was adopted by the municipal authorities, there was a vacancy in one board, an absent member in the other, and one dissenting vote in each; and further, to escape the charge of unconstitutionality, alleged against the act of 1859, admit and insist that the debt thereby imposed on the city was created for the profit and improvement of the city. The contract, then, is plainly violative of the 9th section of said act of 1843, which uses the most general language that could be employed; forbidding the creation of a new debt—that is, of all new debts, without qualification, limitation, or restriction—for purposes of profit or improvement.

4. This section of the act of 1843 is unrepealed by any statute since passed. The 49th section of the act of 15th January, 1844, "To consolidate the several acts of incorporation of the city of Mobile, and to alter and amend the same," expressly leaves it unrepealed.—Session Acts 1843 4, p. 191. The act of 1858 contains no repealing clause. The 3d section of the act of 1859 repeals "all laws, and parts of laws, inconsistent and contrary to this act;"

which effects nothing, because a subsequent act, without such express repealing clause, repeals all preceding statutes so inconsistent that they cannot stand together. Rawls v. Kennedy, 23 Ala. 249. If, then, the act of 1843 be repealed by that of 1859, it must be by implication; a mode of repeal never favored by the courts, and only allowed when the repugnancy between the two statutes is absolute and incontrovertible.—23 Ala. 249; 29 Ala. 451; 33 Ala. 693; 24 Pick. 297; 3 Gill, 138; 2 Cranch, 358; 6 Barbour, 60. But there is no inconsistency or repugnancy between the acts of 1843 and 1859 in this particular: on the contrary, the 9th section of the former might have been incorporated as a distinct provision in the latter. The act of 1859 gives a power, but says nothing as to the manner of its exercise; while the act of 1843 simply prescribes the mode in which that power shall be exercised. Moreover, the rule of construction applies, that special provisions are not repealed by general provisions on the same subject.—29 Ala. 573, 583; 2 Penn. 37, 43; 23 Eng. L. & Eq. 389, 392.

5. The pleadings in this case, in connection with the history of the said act of 1843, show a special reason why said act should not be held repealed by implication; in fact, that it partakes of the character and obligation of a contract. At the time of its passage, the city of Mobile was insolvent; without money, property, or credit, and its effects had been assigned for the benefit of its creditors. Appealing to the liberality of it creditors, a plan of settlement was proposed and adopted, which received the sanction of the legislature in the act of 1843. The 15th section of the act required the creditors to file with the mayor their written assent to the provisions of the act, before the city should become bound to carry out the duties imposed on it. The creditors did so—gave up their former evidences of debt, and received new bonds to the amount of seven hundred thousand dollars, which refer to said acts as part and parcel thereof; and of these bonds, which were received by the creditors on the faith of the security afforded by the act, more than five hundred thousand dollars are now outstanding, and mature in 1863

6. The acts of 1858 and 1859 are unconstitutional, being violative of the 1st and 13th sections of the bill of rights; the former declaring, that " no set of men are entitled to exclusive, separate public emoluments or privileges, but in consideration of public services;" and the latter, that private "property shall not be taken or applied to public use, unless just compensation be made therefor." The object of the latter section was, to restrain the legislature in taking *private* property for *public* use; of the former, to restrain them from taking *public* money, emoluments, etc., for *private* use, or bestowing *public* rights on *private* persons. The contract in this case, if it be justified by the acts of 1858 and 1859, raises public emoluments, and gives them to the stockholders of the railroad company : it collects funds from the public, and invests them in the railroad, which belongs to the stockholders; and the public has no participation in the privileges conferred on the stockholders. To say that the road is a great public benefit, is no answer to this objection. *That* was the ground on which its charter was granted, and on which alone it can be sustained. That the company is now unable to perform the public benefit for which it was created, simply shows a forfeiture of its charter, instead of affording a reason for conferring on it additional privileges. If the road be finished by the aid of these funds, and prove to be of public benefit and advantage, that benefit will have been secured by the money of the taxpayer, equally with that of the stockholder, while the latter reaps all the advantages.

The protection of property is one of the first objects for which governments are instituted, and second only to the protection of life and liberty ; and it is secured by an express provision of the fundamental law, to which alone the courts must look in determining the validity of laws. The money of the appellants in this case has been taken from them, against their consent, and without compensation, and has been bestowed upon a private corporation. If just compensation had been made to them, the act would have been unauthorized, because the use to which the money is applied is not public. A railroad has all

the constituents of private property, and the company to which it belongs is a private corporation.—Ala. & Tenn. Rivers Railroad Co. v. Kidd, 29 Ala. 221; Angell & Ames on Corporations, 23–4, and cases cited. If the railroad could be held a public use, within the meaning of the bill of rights, the act would still be unconstitutional, because just compensation was not made for the property so taken. The amount of tax levied on each citizen, though small, does not affect the principle. If thirty-five hundredths of one per cent. can be lawfully exacted, there is no limit to the power exercised: ten, twenty, or fifty per cent. might with equal propriety be exacted. The aggregate amount paid by the citizens, builds the road in effect, for the amount paid in by the stockholders is comparatively insignificant; and yet the tax-payer receives no interest in the property or franchises of the railroad company, and has no voice in the management of its affairs.

The validity of these laws cannot be maintained under the taxing power of the State. The right of taxation, inherent in every government, is admitted to be without express qualification. But it must necessarily be restrained to the legitimate objects of taxation; otherwise, there is no security to private property, and no distinction between absolute and limited governments. A tax is a levy made for the public service, or a sum collected by public authority to enable the government to discharge its duties; and carries with it the idea of a public due. It is not contended, that the right of taxation is confined to the necessary expenses of the government, or to the mere machinery by which government is carried on; but that it does not include every species of exaction, which, under the name of a tax, may be authorized by the legislature for the purposes of internal improvement, or for the benefit of private corporations, on the idea that commerce or public convenience will be promoted by their undertakings. Public opinion is often in error as to great commercial undertakings: witness the South Sea bubble in England, and the experiment of Alabama in banking. If the legislature may authorize forced contributions under the name of a tax, for the purpose of building a rail-

road belonging to a private corporation, why may it not also tax the public to build a line of boats between Mobile and Montgomery? why not tax Montgomery with the entire cost of the capitol? or Coosa and Autauga with the entire cost of the penitentiary? If these be legitimate objects of taxation, the burden must be borne by all the people of the State equally.

The case of Stein v. Mayor of Mobile, 24 Ala. 591, is relied on by the appellees, as precluding inquiry into this constitutional question. But that case is distinguishable from this, in two particulars: there, the tax was imposed with the direct assent of nearly all the tax-payers, and the tax-payer was entitled to receive stock for the money paid by him; here, the tax-payer receives no compensation for his money, and it is taken from him without his consent. Although a vote of the citizens was taken under the act of 1858, it was not a vote of the tax-payers, as required by that act; nor was any vote of the tax-payers ever taken. The fact that Stein voted against the tax, does not destroy the force of the distinction; since the rule in regard to all partnerships and corporate bodies allows the majority to bind the minority by contracts. Grant on Corporations, 68–9. Stein's case may be maintained on the ground of contract, and on that alone; but the doctrines there laid down, as to the right of taxation, are, in the view of the appellants, inconsistent with the fundamental principles of the constitution. They therefore ask a reconsideration of that case, and of the authorities on which it is founded, against which there has been a growing dissent; believing that the weight of argument, if not of authority, is against its correctness.—Sedgwick on Constitutional Law, 464; 13 B. Monroe, 40–148; 2 Am. Law Register, 27, 65; 5 ib. 289; 24 Barbour, 232.

7. The contract should be set aside on grounds of public policy. It is alleged in the bill, and admitted in the answers, that a majority of the aldermen and common-councilmen were stockholders of the railroad company at the time the contract was approved by the city authorities; and it is evident from a consideration of the terms of the contract, that it is highly onerous to the city, and

greatly advantageous to the railroad company—that is, to the individual stockholders. No actual fraud, or bad faith, is imputed to these public agents. The principle invoked by the appellants, who deem the contract injurious to them, does not rest on fraud or bad faith, but on grounds of sound public policy; the principle that forbids a man to be a judge in his own cause, and prohibits a trustee from acting for his private benefit in the matters pertaining to his fiduciary relation.—23 Ala. 85; 27 *ib.* 430; 16 Eng. L. & Eq. 63; 4 How. (U. S.) 554; Law Register, April, 1860, p. 333; Story on Agency, § 210.

8. This objection to the validity of the contract is sustained by express legislative enactment. The 10th section of the act of 1840, (Session Acts 1839–40, p. 54,) requires each individual member of the municipal boards to take an oath, to the effect that he will not, directly or indirectly, be engaged in any contract with the city corporation, or sell to, or buy from it, any article, interest, or matter whatsoever; and declares every contract, other than for efficient services, in which any officer of the corporation shall be interested, wholly void. The 16th section of the act of 1843 declares, " that it shall not be lawful for any member of either board to make any contract with the corporation to do any work, or perform any service for the same; nor shall any appropriation be valid that shall be made for this."—Session Acts 1842–3, p. 119. The same official oath is prescribed by the 7th section of the act of 1844.—Session Acts 1843–4, p. 178. Under these statutory provisions, the contract is clearly void.—Bell v. Quin, 2 Sandf. 146. The 10th section of the act of 1840 is not repealed by either of the subsequent acts; there being no express repealing clause, nor any repugnancy between the two statutes.—Authorities cited in 4th paragraph, *supra.* Nor are any of these statutes repealed by the acts of 1858 and 1859. The authority conferred by these acts can be exercised without the repeal of the former laws. The existence of the corporation does not depend on the fact that its present members compose it; and the power conferred is vested in the corporation, though it cannot be exercised by its present members.

*Points and authorities for the appellees.*

1. The contract and tax are authorized by the act of 1859. Although the vote taken under the act of 1858 was extended to all qualified electors for municipal officers, yet, in effect, it was limited to tax-payers, who alone are authorized to vote for mayor and aldermen.—Municipal Code, p. 6, § 6. If the vote had not been in strict conformity with the requirements of the act of 1858, the irregularity would not have affected the validity of the contract; for the act of 1859, "in enlargement of" the former act, by express provision, makes that vote sufficient authority to the mayor and aldermen to enter into such contract with the railroad company as they might think proper. The act evidently contemplates, that the amount of present aid extended to the railroad company shall be one million of dollars; and this amount of present aid could be rendered, with greatest ease to the tax-payers, only by the issue of bonds payable at a future day, with interest from date. The payment of these bonds, with interest, was necessarily secured by taxation, because the city had no other means of payment; and the power to issue the bonds, or to create a debt against the city, includes by necessary implication the power to levy a tax to pay the debt.—1 Sneed, 637; 9 B. Monroe, 154; 13 *ib.* 22; 9 Harris, (Penn. St.) 181; 9 Humph. 552; Amer. Law Register, August, 1858, p. 614; 8 *ib.* 298–300; 7 *ib.* 732.

2. No constitutional provision is violated by the acts of 1858 and 1859, or by the contract made under them. The decision of this court in Stein's case, (24 Ala. 590,) which is sustained by the great weight of adjudicated cases elsewhere, conclusively establishes these principles: that the taxing power of the State is not confined to the ordinary expenses of the government, or the mere machinery by which it is carried on; that this power may be constitutionally employed by the legislature in the erection of works of internal improvement, limited only in its exercise by the legislative discretion; that railroads are works of internal improvement which may be thus

aided or built, although owned by p ivate corporations; and that this taxing power, for the benefit of a particular railroad, may be delegated by the legislature to a municipal corporation, and its exercise be made dependent on a vote of the citizens.—Talbot v. Dent, 9 B. Monroe, 526; Clark v. Rochester, 24 Barbour, 484; 1 Sneed, 637; Sharpless v. Mayor of Philadelphia, 9 Harris, 175; Slack v. M. & L. Railroad Co., 13 B. Monroe, 1; 4 Smith's (N. Y.) R. 38; 4 Comstock, 419; 9 Humph. 269, 552; 2 Dev. & Bat. 451; Grant v. Courter, 24 Barbour, 240.

3. The validity of the contract is not affected by the fact, that it was not adopted by the unanimous vote of all the members of both boards, at a full and regular meeting, as required by the 9th section of the act of 1843. The act of 1843 was a limitation on powers already possessed by the corporation—on acts purely municipal, and within the powers granted by the city charter. The acts of 1858 and 1859 create new powers not before possessed by the city, and for purposes not within the ordinary objects of city governments; and they give these powers without qualification. The former is a restraining act, limiting powers already possessed by the city; the latter, an enlarging and enabling statute, conferring new powers for a specific purpose. The two acts contemplate neither the same subject-matter nor the same objects, and are not to be construed *in pari materia*. The repeal of the act of 1843, by the act of 1859, does not impair or affect any vested rights. Neither the 9th nor the 13th section confers any rights on creditors of the city. The act contains no covenant on the part of the city to relinquish the taxing power, for the benefit of its then existing creditors; nor could the city thus strip itself of any portion of its legislative power, or limit the discretion of the legislature.—5 Cowen, 542; 2 Term R. 171; Sedgwick on Constitutional Law, 634, and note. If the creditors have a vested interest under the act of 1843, as under an irrepealable law, the complainants are not in a condition to take advantage of it, not being creditors. If they were creditors, the legislature might nevertheless take away the remedy provided by the act of 1843, without

impairing the obligation of the contract.—4 Wheaton, 200; 1 How. (U. S.) 315. Moreover, the act of 1859, although it may increase the taxes of the complainants, does not diminish the value of the creditors' security, nor impair the obligation of their contract.

4. The fact that several of the aldermen and common-councilmen were, at the time the contract was made, stockholders in the railroad company, does not invalidate the contract. The cases cited by the appellants, respecting judges sitting in causes in which they are interested, and trustees dealing with *cestuis que trust*, have no application to the case. In making the contract, the city authorities acted as agents of the State, and were clothed by statute with the power they exercised; and their acts can only be impeached for fraud.—Walker v. Devereux, 4 Paige, 229; Haight v. Day, 1 Johns. Ch. 18. In regard to judges, it has been settled from the time of the year-books to the present day, that when the law imposes on a judge the duty of trying a case, and no one else can do it in his stead, his interest does not disqualify him. Dimes v. Grand Junction Canal Co., 16 Eng. L. & Eq. 72; Ranger v. Great Western Railway Co., 27 *ib.* 35; 1 Dev. & Bat. 307; 2 Barb. Ch. 39; 5 Mass. 92; 13 Mass. 340; 22 Conn. 190. So, in case of necessity, an interested person may testify as a witness.—United States v. Murphy, 16 Peters, 210; 1 Greenl. Ev. (ed. 1858,) § 348; 12 Ala. 592; 4 Paige, 251; 1 Johns. Ch. 18. If, then, the city authorities acted as judges in making the contract, they are within the exception to the general rule; if as legislators, the principle has no application : as well might it be contended, that an act of the legislature, granting a loan to a railroad company, was rendered void by the fact that one of its stockholders was a member of the legislature. There is no statute prohibiting such contract, or declaring it void; and even if it be a violation of the official oath of any members of either board, (which is denied,) that would not render it void, in the absence of an express provision to that effect.—14 Eng. L. & Eq. 306; 76 *ib.* 200; 77 *ib.* 543.

STONE, J.—1. The constitutionality of the legisla-
tion, under which the city of Mobile has obliged itself to
aid the Great Northern railroad, is assailed, as not being
a legitimate exercise of the taxing power, but a taking
of private property without just compensation, even if
the use for which it is taken be public.

This subject has undergone much and earnest discus-
sion in many of the States composing this Union; and
however grave the subject might be regarded, if it were
an open question, we feel bound to consider it, in this
State, *res adjudicata*. In coming to this conclusion, we
are not unmindful of the opinion, which must obtain
some credence, that we run counter to some of the argu-
ments and illustrations found in the case of Sadler v.
Langham, 34 Ala. 311. The principle we are discussing,
however, was settled and re-asserted in this court, long
before the case of Sadler v. Langham came up; and on
a question involving such momentous results as does
this—one in which the public welfare is so deeply con-
cerned—we feel it our duty to adhere to the rule, *stare
decisis*.

In the case of Stein v. The Mayor of Mobile, (24 Ala.
591,) a question very like the one we are considering was
directly presented. This court reviewed many adjudged
cases of sister States, pronounced on the identical ques-
tion involved in that case and this; and, in a most elabo-
rate opinion, decided, "that the acts authorizing the city
authorities of Mobile to levy a tax on the owners of real
estate within the limits of the city, to aid in the con-
struction of the Mobile and Ohio railroad, were constitu-
tional;" and that although the only legitimate object of
taxation is the support and maintenance of government,
yet this purpose embraces a wider range than the mere
machinery employed in its administration: that the power
authorizes the employment of the necessary appliances to
augment the aggregate wealth and prosperity of the in-
habitants of the city; and that this may be accomplished
by providing outlets for commerce, opening channels of
intercommunication with other parts of the State, &c.
The Mayor &c. of Wetumpka v. Winter, 29 Ala. 651;

Pierce on Railways, 108 to 125, and notes; Redf. on R ilways, 533, and notes; Sharpless v. Mayor, 21 Penn. State R. 147; L. & N. Railroad v. County Court, 1 Sneed, 637.

[2.] As a reason why we should reinstate the injunction in this cause, it has been pressed on our consideration, that the terms of the act, approved February 8th, 1858, (Pamphlet Acts, 165,) were not complied with by the city authorities of Mobile. We deem it unnecessary to institute an inquiry into this subject. Before any aid was extended to the railroad, or determined on by the city, under the act of 1858, the act approved November 29th, 1859, was passed, which decla.ed, "that the vote of the people of the city of Mobile, taken on the 21st day of March, 1859, under an act of the legislature of Alabama, approved the 8th of February, 1858, entitled 'An act to authorize the corporate authorities of the city of Mobile to aid in the construction of a railroad upon a vote of its citizens', shall be sufficient authority to the corporate authorities of said city of Mobile, and they are hereby authorized and empowered to aid in the construction of the Mobile and Great Northern railroad", &c. So, whether the act of 1858 was complied with or not, the act of 1859 conferred on the city authorities ample power to aid said railroad, to the extent, and under the terms prescribed by the last mentioned act. Pamph. Acts of 1859–60, p. 294.

[3.] The doctrine is well settled, that to authorize a municipal corporation to take stock in, or aid in the construction of a railroad outside of the limits of such corporation, there must be an express grant of power.—See City Council v. Plank-road Co., 31 Ala. 76; Pierce on Railroads, 108. The power was expressly conferred in this case. It is contended for appellants in this case, that in making their contract, the city authorities transcended the power conferred on them by the statute, in this, that whereas the statute only authorized them to aid in the construction of the railroad by the issue of city bonds, in an amount not exceeding one million of dollars, yet they have in fact issued their bonds and coupons, and furnished them to the railroad, amounting to over two mil-

lions of dollars. This argument is more specious than solid. The bonds are for the precise sum of one million of dollars; no more, no less. These bonds mature at various times, extending from one to twenty-five years. The excess over one million of dollars consists in obliga-. tions, in the shape of coupons, to pay interest on the said one million of dollars, until such time or times as the principal of the bonds shall be paid. This, we think, is in strict conformity with the spirit of the statute, which evidently contemplated that the bonds should be interest-bearing, and therefore marketable. Anything less would not have furnished a million of aid to the railroad.

[4.] It is further urged in favor of a reversal of the chancellor's decretal order, that by the terms of the contract between the city government and the railroad, no stock is to be issued to the assignee or appointee of the city, for *the interest* it may pay on the bonds. A full answer to this objection is furnished in the fact, that it would be no objection to the constitutionality of the contract, if no stock had been reserved for either the principal or interest to be paid by the city. The power to aid the railroad resting, as it does, on the taxing functions of the city, and not on the constitutional provision in relation to the taking of private property for public use, no direct pecuniary compensation to the tax-payers is necessary to uphold it.—See City of Wetumpka v. Winter, and other authorities *supra;* Pierce on Railways, 115.

[5.] It is further objected to the validity of this contract, that while the acts of the legislature, and the vote of the people, authorized aid to the railroad only by bonds, and refused aid by taxation, yet the city authorities have gone beyond this, and aided both by bonds and taxation.

The question submitted to the voters of Mobile, in this connection, was, whether they would aid *by taxation upon all property subject to taxation, at a rate not exceeding two per centum per annum, for five years, or by the issue of city bonds, for an amount not exceeding one million dollars.*—Pamph. Acts 1857-8, 165. The aid determined on and rendered in this case was by bonds, *not exceeding one million dollars,*

and not by taxation, limited in rate to two per centum per annum, and in duration to five years. The fact that a tax was also levied to meet the bonds, does not change the character of the aid furnished, nor violate the provisions of the statute The real point was, whether aid should be rendered by heavy and rapid assessments, or by the longer and graduated process of city bonds, distributing the burden through a series of years. Such bonds, whenever, and by whatsoever authority issued, are necessarily an interest-bearing fund. They are, also, necessarily, due at some given time. The accruing interest, at the intervals agreed on, and the principal, at the time of the maturity of the bonds, must be paid. The bonds, being debts of the city, in the absence of a stipulation or specification to the contrary, import, *ex vi termini*, a duty resting on the city to meet and liquidate both the interest and principal as they severally accrue. The city authorities, being empowered by the legislature to aid the railroad by bonds, were thereby clothed with the implied power to provide ways and means to meet the liabilities thus incurred, and thus preserve the credit of the city.

In what we have said above, we have considered this question without any reference to legislative restraints resting on the mayor, aldermen and common council of the city of Mobile. The 13th section of the act approved 11th February, 1843, (Pamph. Acts, 116,) declares, "That from and after the first day of November, A. D. one thousand eight hundred and forty-three, and after the issuing of the obligations provided by this act, it shall not be lawful for the corporate authority aforesaid to issue, in any assignable form whatsoever, any bonds, promises to pay, or city orders, or any form whatsover of promises to pay, transferrable from hand to hand, nor to enter into any contract for the payment of money, unless the means for the payment of the money so contracted to be paid shall be specifically provided at the time of making such contract." The present bonds are covered by said 13th section of the act of 1843; were issued after the 1st day of November, 1843, and after the issuing of the obliga

tions provided by that act; and it was, therefore, the manifest duty of the city authorities, when they issued these bonds, to provide the means for their payment. If, then, any doubt remained whether the acts of 1858 and 1859 conferred the authority to provide the means for the payment of these bonds and the coupons, that doubt must be dissipated by the 13th section of the act of 1843, which not only confers the right, but enjoins its exercise as an official duty resting on the city authorities.

We go beyond the merits of this case, and assert that, in the exercise of a discretion vested in the city authorities, as to the plan of providing means for the payment of the interest and principal on the bonds issued for the railroad, we are impressed with the prudence and wise economy which seem to have presided in their deliberations. While it is obvious that the burden has been distributed over a period of about twenty-five years, in such manner as that the assessment shall be uniform, and at no time oppressive; the right is preserved of applying, at the end of each year, the accruing surplus to the extinguishment of the principal of the bonds; the surplus, for this purpose, being each year increased, by an amount corresponding with the progressive diminution of the annual interest. In this way, all the trouble, risk and expense of an accumulating sinking-fund have been avoided.

[6.] No question in this case has been pressed on our consideration with more earnestness, than that which arises under the 9th section of the act of 1843.—Pamph. Acts, 115. Its language is: "That the corporate authorities of the city of Mobile, after the passage of this act, shall not be permitted to purchase real estate, or borrow money, or create any new debt, for purposes of profit or improvement, without a concurrence of the mayor and boards of aldermen and common council, at their regular meetings, upon a full attendance of all the members of both boards, at a time when there shall be no vacancy in either, and none dissenting to the act; which facts shall all appear on the minutes of the corporation; and any contract, made in violation of this act, shall be wholly

29

null and void, incapable of being ratified or confirmed, except in the manner hereinbefore specified."

For the appellants it is contended, that the bonds brought to view in the present record are the creation of *a new debt, for purposes of profit and improvement;* and, inasmuch as the present contract was entered into *without a full attendance of both boards at a time when there was no vacancy in either, and none dissenting to the act,* the argument is that the present contract must fall to the ground. The appellees contend, that if section 9 of the act of 1843 be not repealed, then the provisions of that section must be confined to acts of borrowing money, and the creation of new debts, within the powers of the city government as they then existed; and that that section does not reach or control the exercise of powers conferred on the corporation by subsequent legislation. They contend further, that the acts of 1858 and 1859 confer authority to create a debt for a specified purpose; and that this creation of a new power, without specifying the mode of its exercise, must be understood as so far repealing the 9th section of the act of 1843 as to allow the making of the present contract, in the mode and manner pointed out for the performance of acts of municipal legislation and government.

The act of 15th January, 1844, "to consolidate the several acts of incorporation of the city of Mobile, and to alter and amend the same," expressly preserves, and exempts from repeal, the act of 11th February, 1843. Pamph. Acts 1843–4, p. 191, § 48. The 9th section of the act of 1843 is not, then, directly or expressly repealed.

We can not assent to the argument, that the acts of 1858 and 1859 repeal, or in any manner impair, the 9th section of the act of 1843. The acts of 1858 and 1859 are silent as to the mode and solemnity which shall attend the official actings and doings of the city authorities, under their provisions. There is no incompatibility between the acts of 1858 and 1859, and the 9th section of the act of 1843. Both can stand together, and each can be executed without trenching on the other. So clearly is this the case, that if section 9 of the act of 1843

were re-enacted as an additional section to the acts of 1858 or 1859, no one would suppose that an incongruity would be thereby presented. If, then, the building of the railroad, in aid of which this contract was entered into, comes within the category of *profit* or *improvement*, as expressed in the 9th section of the act of 1843, this contract must fall to the ground; for it is not pretended that both boards were full,—none absent, and none dissenting.

Neither can we assent to the argument, in its unqualified terms, that the regulations prescribed in section 9 of the act of 1843 must be confined to the powers which the city government was then authorized to exercise. Its language is, "after the passage of this act." Its terms embrace all the contracts for the purchase of real estate, all borrowings of money, and all contracts by which new debts shall be created. for purposes of profit or improvement. If the language of the act of 1843 had been, that the city authorities should not borrow money, nor create any new debt, *except for the maintenance of the city government,* we should unhesitatingly declare that its provisions embraced this case. What then, we may inquire, was the purpose of the present debt? Was it *profit* or *improvement,* within the meaning of the 9th section of the act of 1843? We answer this question in the negative, and think the following argument and illustration will demonstrate the correctness of our answer.

It is the settled doctrine of this country, that corporate powers are of three kinds: express, incidental, and implied powers. This doctrine is asserted in the following decisions of this court: City Council of Montgomery v. Montgomery & Wetumpka Plank-road Co., 31 Ala. 83; *Ex parte* Burnett, 30 Ala. 461; Intendant, &c. v. Pippin, 31 *ib.* 542, and authorities cited. See, also, Ang. & Ames on Corp. §§ 256–7; Grant on Corp. 13, in margin; Mayor &c. v. Winter, 29 Ala. 651. It is also well settled, that the right to aid in the construction of a railroad, plank-road, &c., lying without the limits of a municipal corporation, is not within the pale of either implied or incidental powers of such municipal corporation; but must be

expressly conferred, or it can not be exercised.—See Mayor &c. v. Winter, *supra;* City Council of Montgomery v. Plank-road, *supra;* Pierce on Railways, 108; Redf. on Railways, 533–4, and notes. Now, let us suppose that, in the grant of powers to the city government of Mobile, the legislature had empowered that body to *borrow money,* and to *create debts,* for *purposes of profit* or *improvement;* would such grant of power, without more, have authorized the city authorities to aid in the construction of the Great Northern railroad, by a loan to that company of a million of the city bonds? We apprehend no one would assert such a proposition. The *purposes of profit and improvement* would be understood as referring to those ordinary purposes of city policy, which are implied in the fact that the corporation is municipal, or which are expressed in the general grants of power to such corporations, to provide for the health, peace, good order, and general welfare of the inhabitants. Such grant of power would not be understood as conferring authority to aid in the construction of a railroad outside of the city.

Another view: The 9th section of the act of 1844 is a regulation of the power to borrow money, and to create new debts, for purposes of profit and improvement. This is a legislative recognition of an *existing* power in the city government; for the legislature would not perform the senseless ceremony of regulating the exercise of a power which had no existence. The city authorities, then, possessed *the power,* which the legislature attempted, in the 9th section of the act of 1843, to regulate. The power they were regulating was the power to borrow money, and to create new debts, for purposes of profit and improvement. Now, if the regulations prescribed in the 9th section of the act of 1843 be broad enough to cover the contract entered into between the city and the Great Northern railroad, it is difficult to resist the conclusion, that the city authorities would have been authorized to furnish aid to the railroad, without further statutory authority therefor. In other words, the phrase *for purposes of profit or improvement,* in an enabling clause, would certainly be as comprehensive as the same language would

be in the restraining or regulating clause. Yet all parties concede, that without the acts of 1858 and 1859, the city authorities would not have had the power to aid the railroad. The question, then, comes down to this: Power to "borrow money, and to create new debts, for purposes of profit or improvement", would not have authorized the city government to aid in the construction of the Great Northern railroad; the regulations prescribed by the 9th section of the act of 1843 are, in express terms, limited to acts of borrowing money, and creating new debts, for purposes of profit and improvement; therefore, the regulations provided by the said 9th section do not embrace the contract by which the city authorities bound themselves to furnish a million of bonds to the Great Northern railroad.

[7.] The 16th section of the act of 1843 does not govern this case. Its language is, "After the passage of this act, it shall not be lawful for the members of the boards of aldermen and common council to make any contract with the corporate authorities, to do any work, or perform any service for the same, nor shall any appropriation be valid that shall be made for this."—Pamph. Acts of 1842-3, p. 116. Under the present contract, no member of the board of aldermen or common council is *to do any work*, or *perform any service* for the city council.

[8.] The 7th section of the act of 1844 (Pamph. Acts of 1843-4, p. 178) requires the mayor, aldermen and common-councilmen of the city of Mobile, severally to take an oath, not to be, during their continuance in office, "directly or indirectly engaged in any contract with the corporation, or sell to, or buy from it, any estate, interest, or matter whatsoever." An argument adverse to the validity of this contract is based on this section. We deem it unnecessary to inquire whether the present contract is covered by the official oath of the mayor, aldermen and common-councilmen. If it be thus covered, a disregard of this duty may expose the officers to the imputation of official error, or infidelity. But there is nothing in the section which declares such act void, or which imposes a penalty for its violation. In such case, if there

be nothing more in the transaction, the act will be valid in law.—O'Connell v. Sweeney, 5 Ala. 467; Ivey v. Nicks, 14 ib. 564; Staples v. Smith, 12 Wend. 57; Foster v. Oxford &c. Railway Co., 14 Eng. Law & Eq. 306; Lefeuvre v. Lankister, 3 Ellis & Blackb. 530; In re Leefe and Wife, 2 Barb. Ch. 39.

[9.] The only remaining question which we propose to discuss, arises out of the fact that several members of the two boards—the aldermen and common council of the city of Mobile—were also, at the time of the contract, stockholders in the Great Northern Railroad; being, as it is alleged, both bargainors and bargainees. It is not pretended that any bad faith was practiced by the contracting parties; but the argument is, that this contract should be set aside on grounds of public policy. The rule governing contracts between trustees and beneficiaries is invoked.—See Gilmer v. Calloway, and Payne v. Turner, at the present term. The appellants also invoke the rule which prohibits a party from being a judge in his own cause.—See Wilson v. Wilson, at the present term; and Dimes v. Grand Junction Canal, 16 Law & Eq. 63, 73.

In the great case of Ranger v. Great Western Railway Company, before the British House of Lords, (27 Eng. Law & Eq. 35,) Ranger, the appellant, had become a very extensive railway contractor with the company. By the terms of the contract, many matters were made to depend on the decision of the engineer appointed by the company. Mr. Brunel was the engineer. The bill was filed by Mr. Ranger, alleging an improper discharge by Mr. Brunel of his powers as a judge or arbiter in the premises; by which, the complainant alleged, he had lost many thousand pounds sterling. He further alleged, that Mr. Brunel was a stockholder in the company, and was, therefore, not indifferent in the premises; and that he (the complainant) had not known this fact, until recently before the bill was exhibited. One question considered was, whether Mr. Brunel was incompetent, by reason of his interest, to adjudicate the matters which the contract referred to the decision of the company's engineer. Opin-

ions were delivered by Lord Chancellor Cranworth, and by Lord Brougham.

In delivering his opinion, Lord Cranworth said: "When it is stipulated that certain questions shall be decided by the engineer appointed by the company, that is, in fact, a stipulation that they shall be decided by the company. It is obvious that there never was any intention of leaving to third persons the decision of questions arising during the progress of the works. The company reserved the decision for itself, acting, however, as from the nature of things it must act, by an agent; and that agent was, for this purpose, the engineer. His decisions were, in fact, their decisions. The contract did not hold out, or pretend to hold out, to the appellant that he was to look to the engineer in any other character than as the impersonation of the company. In fact, the contract treats his acts and their acts, for many purposes, as equivalent, or rather identical. I am, therefore, of opinion, that the principle on which the doctrine as to a judge rests, wholly fails in its application to this case. The company's engineer was not intended to be an impartial judge, but the organ of one of the contracting parties. The company stipulated, that their engineer for the time being, whosoever he might be, should be the person to decide disputes, pending the progress of the works; and the appellant, by assenting to that stipulation, put it out of his power to object, on the ground of what has been called the 'unindifferency' of the person by whose decision he agreed to be bound. It is to be observed, that the person to decide was not a particular individual, in whom, notwithstanding his relation to the company, the contractor might have so much confidence as to agree to be bound by his award; but any one whom, from time to time, the company might choose to select as their engineer. The appellant alleges, that he did not know the fact that Mr. Brunel was a share-holder, until more than two years after the works had been begun. But he must have known that the company had it in their power to appoint another engineer in Mr. Brunel's place, who might hold shares; or that Mr. Brunel himself might purchase shares."

Lord Brougham said: "He (Mr. Ranger) might have made an exception in his contract, that Mr. Brunel, the engineer, should not hold shares; but that provision was not made. Had this proviso been made, this absurdity would happen, to which my noble and learned friend has adverted, that although not possessed of shares at that time, he might any day have become possessed of shares —he might have purchased them; nay, more, he might have inherited them; they might have come to him by descent, and then he would have been put in this position—that he must either have given up what had come to him, or have ceased to be the engineer employed by the company; for, if he had continued possessed, either by purchase or inheritance, of a single share, according to the rigor of the argument deduced from Dimes v. Gr. Junc. Canal Company, he must have ceased to act under these covenants, and the whole operations of the company must at once have been convulsed."

In the case of Haight and others v. Day, (1 Johns. Ch. 18,) a charter had been granted for a bank, which appointed certain commissioners to receive subscriptions for stock; and empowered them, in case an excess of stock should be subscribed, to apportion the excess among the several subscribers, as they (the commissioners) should judge discreet and proper. A large excess was subscribed, and the commissioners proceeded to exercise their power of apportionment A bill was filed to vacate the alleged apportionment, which charged, that the commissioners had arbitrarily assigned the shares among *themselves*, their *relations, favorites,* &c., and had excluded other equally meritorious subscribers. There was, also, a charge of bad faith; but this was denied by the answer. Chancellor Kent ruled, that "the word *apportion* must mean, here, to assign to each subscriber, or give him, such portion as the commissioners deem meet." The charge of corruption, and of wanton and unworthy exercise of discretion, being repelled by the answer, he dissolved the injunction.

A similar decision was made by Chancellor Walworth, in a most elaborate opinion, pronounced in the case of Walker v. Devereaux, 4 Paige, 229. See, also, Com. v.

Ryan, 5 Mass. 90; Cotton v. Evans, 1 Dev. & Bat. 284; Groton v. Hurlburt, 22 Conn. 178; Conn. &c. Railroad Co. v. Bailey, 24 Verm. 465; U. States v. Murphy, 16 Peters, 203; Crocker v. Crane, 21 Wend. 211; Heydenfeldt v. Townes, 27 Ala. 423.

We think, that the power conferred on the corporate authorities of the city of Mobile, to aid in the construction of the Mobile and Great Northern railroad, under such contract with said Mobile and Great Northern Railroad Company as said city authorities might agree upon, must be construed as conferring the authority to make the contract on whoever may be the mayor, aldermen and common council of said city, at the time the contract is entered into; and that, in the absence of actual bad faith, the fact that certain members of the boards of aldermen and common council are also stock-holders in the rail-road company, does not, *per se*, invalidate the contract.

The decree of the chancellor, dissolving the injunction, is affirmed.